# Illinois Official Reports

## Appellate Court

---

***In re Davon H.*, 2015 IL App (1st) 150926**

---

| | |
|---|---|
| Appellate Court Caption | *In re* DAVON H., LAVELLE H. and SAVANA H., Minors, Appellees (The People of the State of Illinois, Petitioner-Appellee v. Arquita M., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-0926 |
| Filed | October 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 12-JA-1262, 12-JA-1263, 12-JA-1264; the Hon. Bernard Sarley, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas M. O'Connell, of Schaumburg, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and John J. Sviokla II, Assistant State's Attorneys, of counsel), for the People.<br><br>Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), guardian *ad litem*. |

JUSTICE PALMER delivered the judgment of the court, with opinion.
Justices Lampkin and Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1      Following adjudication and disposition hearings, the trial court terminated the parental rights of respondent Arquita M. to her children Davon H., Lavelle H. and Savana H. It found the children to be abused and neglected, respondent to be unfit, respondent should not be allowed visitation and it was in the best interests of the children that a guardian with the right to consent to their adoption be appointed. Respondent appeals, arguing the trial court's findings of abuse and neglect, unfitness and best interests were against the manifest weight of the evidence, it abused its discretion in denying respondent visitation and it erred in admitting an expert witness's testimony. We affirm.

¶ 2                        I. BACKGROUND

¶ 3      Respondent's children Lavelle, Davon and Savana were removed from her care and placed in the custody of the Department of Children and Family Services (DCFS) after the death of Lavelle's twin brother, Lamar. The children had lived with Lamar, respondent and their father Enoch H. Eight-month-old Lamar died on December 12, 2012. An autopsy showed he died as a result of cerebral edema due to fracture of his skull from multiple blunt force injuries of varying ages. He also showed blunt force injury of the torso with back and stomach contusions and healing rib fractures. His death was ruled a homicide.

¶ 4      A medical trauma assessment of Lavelle, Davon and Savana shortly after Lamar's death showed 8-month-old Lavelle had two separate skull fractures from acute blunt force trauma from two separate impacts. As neither of his parents had sought help for his injuries or reported a fall or impact, his injuries were deemed "occult." The medical assessment also showed 21-month-old Davon had a rib fracture that was between a week and two to three weeks old. His injury was also deemed occult as it had not been reported. Savana, who was almost three years old, had no injuries. Although respondent and Enoch were the children's only caretakers, they denied any knowledge of Lamar's, Lavelle's and Davon's injuries. However, Enoch subsequently confessed to hitting the children and was convicted of killing Lamar. Enoch is now deceased.

¶ 5      Shortly before Lamar was killed in December 2012, respondent had given up her parental rights to her first three children, Trevion, Trevon and Davonta. In 2008, one-month-old Trevion had been found to have a complete break of his left femur. By stipulation, Dr. Richard Heller, an expert in pediatric radiology, would testify that "such an injury would have to have been caused by a significant degree of force, and if not caused intentionally, the only reasonable [*sic*] consistent accidental explanation would have been one of the nature of car accident" and "no accidental explanation for the injury exists in the medical records." He would testify that, at the time of the injury, Trevion "would have been hysterical with pain" and his caretaker would have immediately known of the event that caused the injury due to the baby's symptom's yet his injury was already approximately a week old before respondent

brought him to the hospital. Although respondent stated she and Enoch were Trevion's only caretakers and never left him unsupervised, neither she nor Enoch had an explanation for the baby's injury. Trevion, Trevon and Davonta were removed from respondent's care. The children were found to be abused and neglected and respondent unfit. In August 2012, respondent signed a consent for the adoption of the three children. However, between the time the first three children were removed from respondent's care in 2008 and she consented to their adoption in 2012, she continued to reside with Enoch and gave birth to Savana, Davon, Lamar and Lavelle.

¶ 6    In December 2012, the State filed petitions for adjudication of wardship over Lavelle, Davon and Savana. It alleged that, under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq*. (West 2012)), the children were neglected as their environment was injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2012)) and abused due to a parent or someone in their household or immediate family creating a substantial risk of physical injury to the children "by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function" (705 ILCS 405/2-3(2)(ii) (West 2012)). Lavelle's petition also alleged he was physically abused as a parent or someone in his household or immediate family created a substantial risk of physical injury to him "by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function" (705 ILCS 405/2-3(2)(i) (West 2012)). The court entered an order denying the parents visitation.

¶ 7                         A. Supervised Visitation Hearing

¶ 8    Respondent moved for supervised visitation with Lavelle, Davon and Savana. After a hearing, the court denied the motion on April 26, 2013. During the hearing on the motion, the court admitted into evidence a report by Dr. Glick in which she discussed Lavelle and Davon's injuries, the fact that the injuries were unreported and untreated, Lamar's death and Trevion's earlier injury and she stated her opinion that there was evidence of abuse. The court also received into evidence a DCFS integrated assessment report of respondent. It heard testimony from respondent, her mother and the children's caseworker.

¶ 9    Respondent testified that she had never noticed any injuries on Lavelle or Davon, that they were acting "as normal when I changed their pampers" and "ate as normal." On the day Lamar died, the children were playing "as normal," she left the house and when she came back Enoch told her Lamar was having difficulty breathing so she took him to the hospital. Prior to that date, she had never noticed anything wrong with Lamar or the other children. She did not know how Lavelle suffered the skull fractures or Davon suffered a broken rib. Responded stated she was attending therapy sessions at her own request. She did not believe she was at all responsible for the case coming into the system, stating she did not "do anything" to the children.

¶ 10   Respondent's mother Yvonne Mays testified that, from what she saw before December 2012, respondent took good care of her children, did not abuse them, treated them "nice" and had a strong bond with them. She had never seen respondent abuse them or Enoch hit them. Mays thought it would be in the children's best interest to have supervised visitation with respondent as "every child should be around their mother" and she did not think the children would be at risk of harm during such visits. She stated she spoke to the children several times a

week, saw them once a week and they asked about their mother. She had been told by police officers that Lamar died from being "hit" and that Lavelle and Davon had been "hit" too.

¶ 11    Lutheran Social Services of Illinois (LSSI) caseworker Critella Holmes was assigned to the children's case in December 2012. She testified respondent had been "assessed" for individual therapy and was participating in therapy with Dr. Callie Pittman. In March 2013, LSSI held a "staffing" meeting with its program director, two supervisors and Holmes to discuss respondent's request for supervised visitation. Holmes testified "all parties involved" in the meeting unanimously agreed that LSSI would not recommend supervised visitation as LSSI wanted the children to undergo trauma therapy prior to having visits with respondent. Holmes stated that, if the children's therapist recommended visits, then the agency would agree to them, "[b]ut right now, *** because the agency felt that the biological mother failed to protect and keep those children safe in her care," it did not agree that visitation should be granted. Holmes stated an additional reason for LSSI's decision was the fact that respondent was still having contact with the biological father after he admitted harming her children, visiting him in jail. Holmes testified that, because of what happened to the children and what they had seen, "who did what to who," LSSI did not yet know whether the children should have a relationship with their mother. It was LSSI's opinion that respondent did not give a satisfactory explanation for what happened to the children and, having heard respondent's testimony that day, Holmes agreed.

¶ 12    Considering that the children suffered broken bones over a period of time from ongoing abuse, Holmes did not know when LSSI would be able to recommend visitation. LSSI would wait until the children received the specialized trauma therapy and their therapists recommended visitation. She stated that if respondent's therapist notified LSSI with a favorable opinion, then LSSI would "restaff" the issue but LSSI would "want" progress by respondent in therapy. LSSI was concerned that, even though respondent stated she lived together with her children in a two bedroom apartment during a time when three of the children had broken bones and bruises, respondent reported never noticing any bruises or injuries on her children prior to Lamar's death. Holmes testified LSSI thought it "impossible" that respondent did not notice the injuries, yet respondent "always" stated that she had not done "anything" to her children and "she didn't notice anything about anything."

¶ 13    Holmes testified that when Davon and Savanna first came "into the system," they were having night terrors. Their caregiver told Holmes the children were getting only an hour's sleep per night for the first month, waking up screaming in fear. Initially, the caregiver was unable to calm the children. However, after receiving de-escalation and trauma training, the caregiver became able to calm the children. The caregiver also received training on how to restrain Davon, as the child was "head banging." Holmes stated Savana and Davon's night terrors had decreased since coming into the system. Initially, their caregiver had phoned Holmes almost daily with reports of the children's terror and her inability to help them. But recently, the night terrors had diminished to once or twice a week, "a tremendous improvement." It was LSSI's position that, although the children would not suffer physical harm during a supervised visit with respondent, they would suffer emotional harm and be retraumatized. Holmes noted the children were too young to express whether they would be traumatized by seeing respondent.

¶ 14    The trial court denied the motion for supervised visitation. Pointing to the evidence regarding Lamar's death and Lavelle and Davon's injuries, the fact that LSSI recommended

denying supervised visitation until after the children had received trauma therapy and their therapists recommended visitation and that Holmes' testimony showed, in the court's words, "a couple of the minors have had serious, serious emotional and psychological problems in that they've woken up screaming," the court found respondent failed to show it was in the children's best interests to allow supervised visitation. It stated it would reconsider its decision once supervised visitation was found to be "therapeutically appropriate."

¶ 15                               B. Adjudication and Fitness Hearing

¶ 16        In September 2013, the State moved to amend the wardship petitions to seek permanent termination of parental rights at disposition and the appointment of a guardian with the right to consent to adoption. In December 2013, the court allowed the amended petitions to be filed. In the amended petitions, the State alleged respondent was unfit to parent by clear and convincing evidence under the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2012)) as she failed to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2012)); committed extreme or repeated cruelty to the children (750 ILCS 50/1(D)(e) (West 2012)); failed to protect the children from conditions within their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2012)); and behaved in a depraved manner (750 ILCS 50/1(D)(i) (West 2012)). The petitions also alleged the children had been with their foster parents since April 2013, the foster parents were considering adoption and the adoption would be in the best interests of the children.

¶ 17        In June 2014, the court conducted a consolidated adjudication and fitness hearing. Dr. Jill Glick, a professor of pediatrics at the University of Chicago Comer Children's Hospital and board-certified in pediatrics and child abuse pediatrics, testified regarding the examination of Lavelle, Davon and Savana at the Comer Children's Hospital and her opinions regarding the source of the children's injuries.[1] The children had been transferred to the children's hospital when Mercy Hospital's examination showed Lavelle had skull fractures and DCFS requested all the siblings be examined given Lamar's death and concerns about child abuse.

¶ 18        Dr. Glick testified Savana's examination two days after Lamar's death showed no injuries but 21-month-old Davon was found to have a rib fracture. She explained the fracture was "not acute, meaning it didn't just happen." She stated "acute" would mean the fracture was "a few days old" but radiographic evidence showed Davon's fracture was "weeks old, two, three weeks old." Dr. Glick testified rib fractures are "unusual" in children of Davon's age as such fractures are caused by "usually a blunt force, and based upon the activities of children and what they do, they don't usually get into those kind of scenarios where you'll see a rib fracture like a major car accident or a fall out of a window, some blunt force like playing soccer or falling on a track or something like that when running so they are just uncommon."

¶ 19        Over respondent's objection, Dr. Glick testified regarding what the caretaker of a child with a broken rib would notice about the child. She stated a child with a rib fracture would be in pain and have discomfort as the rib would move and hurt, explaining people with rib fractures

---

[1]Dr. Glick is the medical director of the Child Protective Services Team at Comer Children's Hospital. She testified the team's mission is to identify victims of child abuse and provide expertise in the diagnosis of child mistreatment. The team also is a part of the Multidisciplinary Pediatric Education and Evaluation Consortium (MPEEC), a DCFS program which provides medical experts to examine children under three years of age who are reported to have head or skeletal trauma.

do not want to move their chests or have a bowel movement and they breath "very shallowly." Unlike other children, a child with a rib fracture would not want to be held as it is uncomfortable. As the child's fussiness would be persistent, "it would bring cause to worry that there is more" as the child would be inconsolable. It might take two to three weeks for a bone to heal.

¶ 20      Dr. Glick testified she examined eight-month-old Lavelle herself on the day after Lamar's death. He had external swelling to his head on both sides of his skull and "boggy, swelling areas." She stated there were "two bulging spots" on the sides of his head and "when you looked at his scalp and touched his scalp, you could see that there was deformity." A CT scan showed two separate skull fractures, one on each side of his head. Dr. Glick testified the fractures would be from two separate impacts, two separate blows to the head. She stated the impacts had occurred within a few days of being seen at the hospital as the swelling indicated that the injuries were "new and fresh" and "a couple of days of age." She explained it takes two to three days before swelling from head trauma becomes visible. Respondent objected to Dr. Glick's testimony regarding the age of the injury, asserting it had not been previously disclosed. The court overruled the objection. Dr. Glick testified that, given the ages of the injuries, Davon's weeks-old rib fracture and Lavelle's days-old skull fractures had been caused at different times. She testified, over respondent's objection, that the caretaker of a child with skull fractures would notice "obvious swelling on both sides of the head."

¶ 21      Dr. Glick testified it was her opinion to a reasonable degree of medical certainty that Davon's rib fracture and Lavelle's skull fractures were "inflicted" injuries, meaning they were not caused by a natural phenomena such as an accident or bone disease. She did agree it was "hypothetically possible" that Lavelle's injuries were caused by accidental means as "anything is possible."

¶ 22      Dr. Glick had not been provided with any history or "accidental explanation" for the children's injuries, and she did not interview respondent or speak with the older children regarding their injuries. The court admitted into evidence the medical examiner's report on Lamar. Dr. Glick had read the report in preparing her opinions regarding the cause of Davon and Lavelle's injuries. She stated the report showed Lamar had injuries to the head, skull fracture, contusions to the brain, "abdominal involvement," peritonitis and a healed or healing rib fracture and his death was ruled a homicide.

¶ 23      The court also admitted into evidence a report dated December 13, 2012, that Dr. Glick wrote for DCFS's Multidisciplinary Pediatric Education and Evaluation Consortium program (the MPEEC report). In the report, she summarized her opinions regarding the children's injuries and explained "the basis for [her] opinion that all three children [Lamar, Lavelle and Davon] were victims of abuse."[2] Dr. Glick acknowledged she stated in her report "that rib fractures in young children, babies is highly suspicious for abuse, but there could be a plausible and truthful explanation, meaning an accidental injury is possible."

¶ 24      Detective Mann, a Lynwood police officer, testified regarding his investigation of Lamar's death and the recorded interviews he conducted with respondent and Enoch. The compact disks with the interview were admitted into evidence. The court also admitted into evidence the medical records of Lavelle, Davon and Savanna.

_____

[2]Dr. Glick acknowledged the December 13, 2012, date on the report was incorrect as Davon and Savanna were not examined until December 14, 2012.

¶ 25    LSSI caseworker Holmes testified she was assigned to work with the H. family, specifically Trevion, Trevon and Davonta, for the first time in 2009. She stated that, in 2011, she received a telephone call from the children's guardian *ad litem* who reported that Trevon had told her his father, Enoch, had hit him with a plastic baseball bat during an unsupervised visit. Over respondent's objections, Holmes testified she went to see Trevon at his foster home. He told her Enoch had hit him with a plastic baseball bat.[3] Holmes then visited Davonta at his foster home. He told her Enoch hit Trevon with a plastic baseball bat. He also told her that respondent had hit him two or three times. A few weeks later, during an LSSI "staffing" meeting, Holmes asked respondent and Enoch about the children's claims. Both denied striking the children and respondent stated Trevon was not telling the truth. LSSI suspended unsupervised day visits but allowed the parents supervised visitation with Trevion, Trevon and Davonta. Holmes supervised all visits. During one supervised visit shortly after the staffing meeting, Holmes observed respondent give Davonta and Trevion a popsicle but denied Trevon a popsicle. Holmes stated it was obvious that Trevon was "upset" that he did not receive a popsicle so she asked respondent why she denied the child a popsicle. Respondent told her that she had offered him one but he declined it. Holmes testified she did not hear Trevon say he did not want a popsicle. Although it concerned Holmes that respondent "blatantly" ignored Trevon, he did not appear to be afraid of his mother. At some point, LSSI again agreed to allow unsupervised visits after respondent and Enoch agreed to resume "parent-child coaching."

¶ 26    Holmes testified that, by September 2012, respondent and Enoch had four more children, Lamar, Lavelle, Davon and Savana. In late 2012, the guardian *ad litem* reported that Enoch had pushed or kicked Savana and she hit her lip on the television. Savana could not verbalize what had happened but Trevon told Holmes the incident had occurred. Holmes stated she thought Davonta had told her the same thing. Interviewed at their apartment, respondent and Enoch denied hitting or pushing Savana. Holmes visited the family at their home at least once a month and always found Lamar, Lavelle, Davon and Savana to be well fed and cared for. She saw no signs of abuse or neglect and noted the children did not appear to be afraid of respondent and seemed to have a strong bond with their mother, always greeting her with hugs. LSSI had no concerns that the children were suffering corporal punishment.

¶ 27    Respondent's mother, Yvonne Mays, testified she often had visited Lamar, Lavelle, Davon and Savana at their home. The children appeared well cared for and she never saw anything "wrong" with them. The children did not seem afraid of their parents but she noted Enoch was stricter with them. The children never told Mays of any abuse or neglect they suffered from respondent or Enoch and she never saw either parent use corporal punishment on the children. Mays stated respondent seemed to be a good parent, "you could tell they loved her and she loved them." Respondent's sister, Shana Mays, testified similarly that she saw respondent and the children occasionally, had no concerns regarding how the children were treated and never saw any signs of abuse or neglect.

----

[3]The trial court overruled respondent's objection to the admission of hearsay statements made by a child not the subject of the proceeding at bar, noting that evidence of abuse and neglect by a parent of a child is admissible to prove abuse or neglect of another sibling. See 705 ILCS 405/2-18(3) (West 2012) ("In any hearing under [the Juvenile Court Act], proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible.").

¶ 28   The trial court held all three minors to be abused and neglected. It found Dr. Glick's medical testimony was credible. The court stated Dr. Glick's testimony that Davon's three week old injury would have been severe enough to have caused him a significant amount of pain and discomfort led to the inference that "the parents *** would have been aware of some problem and did nothing about it during those three weeks." With regard to Lavelle's skull fractures, the court noted Enoch had confessed to hitting both Lavelle and Davon. It found that, "for whatever reason," respondent did not do enough to protect her children, "[a]nd whether it be fear or whatever reason, she has a responsibility as their mother to protect them [and] she did not." The court found respondent should have known that the children's injuries had occurred but did nothing until after "Lamar was actually killed."

¶ 29   Based on this evidence, the court found the State sustained its burden to show by clear and convincing evidence the physical abuse of both Davon and Lavelle. It therefore held that Davon and Lavelle suffered "neglect injurious environment" and "abuse substantial risk of injury by the same standard." It found the State proved by clear and convincing evidence that Savana had also been subjected to neglect injurious environment and abuse substantial risk of injury. The court held that Enoch was the perpetrator of the physical abuse to Davon and Lavelle and respondent was the perpetrator of neglect injurious environment and abuse substantial risk of injury as to the three children "for not doing enough to protect the children and subjecting them to that neglect and abuse."

¶ 30   With regard to respondent's unfitness, the trial court held that the State proved by clear and convincing evidence that respondent was unfit under "ground B" for her failure to maintain a reasonable degree of interest, concern or responsibility for the children's welfare and "ground G" for her failure to protect them for the same reasons it had stated earlier and "by allowing the minors to remain in this environment."

¶ 31                            C. Disposition and Best Interests Hearing

¶ 32   Given the trial court's findings that the children were abused and neglected and that respondent was unfit, the case proceeded to a consolidated disposition and best interest hearing. Carolyn Haslett, Enoch's aunt, testified she was Davon and Savana's foster parent and she wanted to adopt them. She had three other children, all of them her siblings' children whom she had adopted. If allowed to adopt Davon and Savana, she thought they should be allowed contact with their mother as all of her other children had contact with their mothers and she wanted all her children to know their mothers.

¶ 33   Ms. Haslett testified that Savana was almost two when she arrived at Haslett's home. Savana had a very "hard time" when she first arrived at her foster home, "night terrors, waking up every night screaming, crying," destroying and tearing at things. She was still undergoing counseling and saw her therapist every week. She talked with her therapist about bad dreams but she was doing "a lot better." Although Savana still had night terrors, they have decreased.

¶ 34   Davon was one year old when he arrived at Ms. Haslett's. He had the same night terrors as Savana but he would hit others and hit himself, hitting his head on the floor, hurting himself. Haslett testified Davon had a bruise on his head "now" because, as his therapist had warned her, therapy was opening some "wounds" and Davon would be acting out. He had, however, improved from when he first arrived as, at first, he was not sleeping at night, "he would holler and scream all night" but now "it was better."

¶ 35 Ms. Haslett testified she loved all her children and there was not anything she would not do for them. She knew respondent well and had thought she and Enoch were "beautiful parents," struggling but trying to take care of their young children. If the "no contact" order barring respondent from seeing her children was lifted, Haslett had no objection to respondent visiting Davon and Savana as she would do "what the court [told] her to do." She stated if the psychologist stated the children were ready to see respondent, then "fine" but she wanted to make sure the children were "ready" to see their mother as she did not want them to regress "back into that anger and the pain."

¶ 36 Alicia Hampton, respondent's half-sister, testified she was Lavelle's foster parent and wanted to adopt him. She stated Lavelle was seven months when he arrived in her home and now was almost three, a loving child doing well in day care and a part of her home. If she were to adopt Lavelle, she would allow supervised visits with Lavelle "if it's okay," was in the best interest of Lavelle and as "long as everything was safe."

¶ 37 David Wilson, a child welfare specialist with LSSI, was assigned to work with respondent, Lavelle, Davon and Savana in April 2014. He testified LSSI had determined that day that respondent's parental rights should be terminated as it was in the children's best interests that they be placed for adoption. He visited the children in their foster homes monthly, found the foster homes were safe and appropriate and the children were comfortable and happy. Wilson stated that, as a result of the no contact order, respondent had not been referred for parent/child services such as parent/child psychotherapy and "parenting coaching" as such services would entail contact with the child. He agreed that in order for a parent to regain custody of a child, the parent had to engage in recommended reunification services and acknowledged that respondent had not been provided with such services. He could think of nothing LSSI could have done to help respondent reunite with her children.

¶ 38 Respondent testified she wanted visitation with her children, she missed them, loved them, had not done "anything," would never injure or hurt them and had been fighting to get her children "back." She stated if the court decided not to terminate her parental rights, she was ready and willing to engage in recommended services in order to be reunited with her children. Respondent stated she had already put herself in counseling with Dr. Callie Pittman but the counseling ended in May 2013 and she had not sought further treatment.

¶ 39 Dr. Pittman testified she had a doctorate in clinical psychology, was not yet licensed by the State of Illinois and worked as a child and adolescent therapist at Grand Prairie Services. She was assigned to respondent's case in January 2013, when respondent came to Grand Prairie Services "with an accumulation of losses" as her son had died, her boyfriend had been arrested and her father had died recently. Dr. Pittman stated the goals and objectives for respondent were to "get" her children back, handle stress better and to grieve. Respondent received assessment treatment planning, case management and individual therapy as well as community support service. Dr. Pittman testified she saw respondent usually once a week from January to May 2013 and respondent actively participated in the recommended services but the therapy sessions were terminated due to lack of insurance. Although she believed respondent had made progress in her therapy sessions and gained insight into why her children were removed from her care, she stated "[w]e were still working on accepting responsibility *** for her own actions *** for the care regarding her children." Dr. Pittman found respondent was still in need of ongoing individual therapy. In the mental health assessment report she prepared regarding respondent, Dr. Pittman recorded that, when she contacted respondent on Lamar and Lavelle's

birthday, respondent told her she was feeling fine, which Dr. Pittman recorded "was likely a denial of her feelings." She also recorded that "it appears [respondent] continues to have an unrealistic view of what life would be like when she regains custody of her remaining children," "is not accepting of the challenge she may face" and "is unable to work in preparing for stressors" and that respondent became defensive when Dr. Pittman attempted to discuss these issues.

¶ 40    On February 25, 2015, the court found it in the best interest and welfare of Lavelle, Davon and Savana to adjudge them wards of the court. It found respondent unable for reasons other than financial circumstances alone to care for, protect, train or discipline the children and further found her unfit based on the court's prior proceedings. It found that reasonable efforts at reunification were inappropriate given the evidence regarding the abuse, neglect and termination of parental rights regarding Travion, Travon and Davonta; Lamar's death at the hands of his father; and the "serious injuries" to Davon and Lavelle that resulted in the abuse and neglect findings and the unfitness findings. Based on all of this "conduct," the court found it was not unreasonable for "the agency" to "not offer services" and it was therefore appropriate to withhold visitation. The court found it in the children's best interests to remove them from respondent's custody and ordered that the children be placed in the custody of DCFS with the right to place the children for adoption.

¶ 41    With regard to the State's request for termination of parental rights, the court found the State has clearly shown by a preponderance of the evidence that the children were abused and neglected and had shown by clear and convincing evidence that respondent was unfit for failure to protect the children and failure to maintain a reasonable degree of interest, concern or responsibility for the children's welfare. It reiterated that "reasonable efforts" were inappropriate in the case. The court also stated the evidence showed that, under the care of the children's foster parents, their condition and behavior improved vastly, "in no small measure due to the care that the foster parents provided." On these bases and the best interests of the children, the court ordered that respondent's parental rights be involuntarily terminated and a guardian with right to consent to adoption be appointed.

¶ 42                                   II. ANALYSIS

¶ 43    Respondent raises four arguments on appeal, asserting (1) the trial court's findings at the adjudication hearing that respondent committed abuse and neglect of the three children and was unfit to parent were against the manifest weight of the evidence, (2) the court's findings at the disposition and best interests hearings were against the manifest weight of the evidence, (3) the court abused its discretion in denying respondent visitation and (4) the court erred in admitting portions of Dr. Glick's testimony. We address first the court's findings on the petition for adjudication of wardship, then its findings regarding the petition for termination of respondent's parental rights, its denial of supervised visitation and its admission of Dr. Glick's testimony.

¶ 44                          A. Adjudication of Wardship
¶ 45                          1. *Abuse and Neglect Findings*
¶ 46    On a petition for wardship, following placement of a child in temporary custody, the trial court must make a finding of abuse, neglect or dependence before it conducts an adjudication of wardship. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004); 705 ILCS 405/2-21 (West 2012). The

trial court here found the State proved by clear and convincing evidence that the three children had been subjected to "neglect injurious environment" and "abuse substantial risk of injury." It held that Enoch was the perpetrator of the physical abuse to Davon and Lavelle and respondent was the perpetrator of neglect injurious environment and abuse substantial risk of injury as to all three children "for not doing enough to protect the children and subjecting them to that neglect and abuse." Respondent argues the court's findings were against the manifest weight of the evidence. She asserts the record is "devoid" of any factual support for the findings of abuse and neglect against her or that she was a perpetrator of any abuse or neglect against her children.

¶ 47    The State must prove its allegations of neglect or abuse by a preponderance of the evidence, establishing the allegations are more probably true than not. *In re Arthur H.*, 212 Ill. 2d at 464; *In re N.B.*, 191 Ill. 2d 338, 343 (2000). The trial court has broad discretion when determining the existence of neglect or abuse as it has the best opportunity to observe the demeanor and conduct of the parties and witnesses and is therefore in the best position to determine the credibility and weight to be given to the witnesses' testimony. *In re Stephen K.*, 373 Ill. App. 3d 7, 20 (2007). Upon review, the trial court's finding of abuse or neglect will not be reversed unless it is against the manifest weight of the evidence. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). A ruling is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 48    If the State satisfies its burden of proof to prove either abuse or neglect, then the trial court must proceed to the second adjudicatory stage, in which it determines whether " 'it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court.' " *Id.* (quoting 705 ILCS 405/2-21(2) (West 2000)). "Cases involving abuse, neglect and wardship are *sui generis*; each case must be decided on its own distinct set of facts and circumstances." *In re M.W.*, 386 Ill. App. 3d 186, 197 (2008).

¶ 49    The Act sets forth multiple definitions for a "neglected" minor and an "abused" minor. 705 ILCS 405/2-3(1), (2) (West 2012). At issue here are the court's findings that Lavelle, Davon and Savana were neglected under section 2-3(1)(b) of the Act and abused under sections 2-3(2)(i) and 2-3(2)(ii) of the Act.

¶ 50                                    (a) Neglect Finding

¶ 51    Section 2-3(1)(b) defines a neglected minor as "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2012). "Generally, 'neglect' is defined as the ' "failure to exercise the care that circumstances justly demand." ' " *In re Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). " ' "[Neglect] embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." ' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *Labrenz*, 411 Ill. at 624). The term "injurious environment" has been similarly recognized as an amorphous concept that cannot be defined with particularity. *Id.* "In general, however, the term 'injurious environment' has been interpreted to include 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 52 The evidence supports the trial court's findings that Lavelle, Davon and Savana were neglected as their environment was injurious to their welfare and that respondent was the perpetrator of that neglect. Respondent allowed Lavelle, Davon and Savana to remain in an environment where they were either physically abused or witnessed the physical abuse of their siblings at the hands of their father. Dr. Glick's testimony showed the evidence of that physical abuse was inescapable, as the injuries to Lavelle were severe enough to manifest visible swelling and tenderness of both sides of the infant's head and Davon's broken rib would have been so painful that he would have tried not to move, would not want to be held and would be inconsolable in his pain and distress. The court found Dr. Glick credible. Given the evidence of evident injuries, the record supports the court's finding that respondent ignored the physical abuse and the evidence thereof, did not get help for Lavelle and Davon and did not protect them. The evidence shows respondent breached her parental duty to ensure a safe and nurturing shelter for Lavelle and Davon, allowing them to remain in an environment injurious to their welfare. Accordingly, the court's findings that Lavelle and Davon were neglected and that respondent was the perpetrator of that neglect were not against the manifest weight of the evidence.

¶ 53 "[P]roof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2012). "A parent's behavior toward one minor may be considered when deciding whether a sibling is exposed to an injurious environment." *In re K.G.*, 288 Ill. App. 3d 728, 736 (1997). Accordingly, the State's showing that respondent neglected Lavelle and Davon is admissible evidence that respondent similarly neglected Savana. Respondent's failure to protect her three children from harm and provide them with a safe and nurturing home falls within the concept of statutory neglect. *Id*. There is no opposite conclusion clearly evident as the testimony from respondent's mother and sister and caseworker Holmes that they did not witness respondent abusing the children and did not see signs of neglect or abuse does not compel a different conclusion. Accordingly, the trial court's findings that the three children were neglected as their environment was injurious to their welfare and that respondent was the perpetrator of that neglect were not against the manifest weight of the evidence.

¶ 54                                             (b) Abuse Finding

¶ 55 The trial court also found Lavelle and Davon abused under sections 2-3(2)(i) and 2-3(2)(ii) of the Act and Savana abused under section 2-3(2)(ii) of the Act. Respondent argues the court's findings of abuse were against the manifest weight of the evidence. In order to proceed to the second stage of wardship determination, the State need only prove either abuse or neglect. *In re Arthur H.*, 212 Ill. 2d at 464. As previously determined, the trial court's finding that the State proved by a preponderance of the evidence that the children were neglected was not against the manifest weight of the evidence. The neglect finding, standing alone, is sufficient to propel the case to the next stage of the wardship determination. *Id*. Therefore, we need not address respondent's argument regarding the court's abuse findings.

¶ 56                                             2. *Wardship*

¶ 57 Following the disposition hearing, the court found it in the best interests and welfare of Lavelle, Davon and Savana to adjudge them wards of the court, finding respondent unable for

- 12 -

reasons other than financial circumstances alone to care for, protect, train or discipline the children. It also found her unfit based on its findings in earlier proceedings and that reasonable efforts at reunification were inappropriate. The court ordered the children removed from respondent's custody and placed in the custody of DCFS with the right to place the children for adoption.

¶ 58    At a dispositional hearing, the court must determine whether it is in the best interests of the minor and the public that the child be made a ward of the court. *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 42; 705 ILCS 405/2-22(1) (West 2012). "The court may place the minor under DCFS guardianship if the court determines that the child's parents 'are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents.' " *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 42 (quoting 705 ILCS 405/2-27(1) (West 2012)). We will reverse the trial court's determination of wardship " 'only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order.' " *Id.* ¶ 44 (quoting *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006)).

¶ 59    Respondent argues the court abused its discretion in finding her "unable" to care for, protect, train or discipline her children, asserting the record shows she "provided a safe and loving home" for them. As the litany of evidence recited above shows, the record supports a finding that respondent provided anything but "a safe and loving home" given the physical and emotional injury to which she allowed her children to be subjected and the lack of care or concern she gave to their evident physical and emotional distress.

¶ 60    Respondent also argues that, typically, parents are provided with services for the purpose of reunification with their children and, as she was not permitted visits or such services, there was no opportunity for her to regain custody and, therefore, a finding that she was "unable" based on lack of compliance with a service plan or required services was improper. However, the court did not find her "unable" due to her failure to participate with a service plan. It found her unable because she subjected her children to an environment in which they were physically and emotionally abused, ignored their evident injuries and consistently disclaimed any knowledge of or responsibility for the children's condition or the reason they were taken from her custody. Her argument is meritless.

¶ 61    Respondent lastly argues that, "for the reasons stated above" but without citation to specific legal authority or the record, the trial court abused its discretion in finding it not unreasonable for "the agency" not to offer her services and visitation. The cited "reasons stated above" consist of her arguments regarding the court's findings that (1) she was unable to care for, protect, train or discipline her children and (2) it was in the children's best interests to terminate her parental rights. None of the "reasons" she stated "above" have any bearing on whether the court erred in holding that reasonable efforts at reunification were inappropriate. Without citation to legal authority and the record, her argument is forfeited. *In re Estate of Michalak*, 404 Ill. App. 3d 75, 90 (2010).

¶ 62    Respondent does not challenge the court's determination that it was in the best interests of the children that they be adjudged wards of the court. Although she makes some argument regarding the children's best interests in this section of her brief on appeal, she makes those assertions solely in the context of the court's termination of her parental rights, not in the

context of its adjudication of wardship. Accordingly, given the inadequacy of respondent's arguments regarding the court's "unable" finding and her lack of argument regarding the best interest wardship determination, we affirm the trial court's adjudication of wardship with the right to place the children for adoption.

¶ 63                                    B. Termination of Parental Rights

¶ 64     The involuntary termination of parental rights upon a petition of the State is governed by the Act (705 ILCS 405/1-1 *et seq.* (West 2012)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2012)) and requires a two-step process. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). First, the State must show by clear and convincing evidence that the parent is " 'unfit' " as that term is defined in section 1(D) of the Adoption Act. *Id*. at 494-95 (quoting 750 ILCS 50/1(D) (West 1998)). Second, if the court finds that the parent is unfit, then it must consider whether it is in the best interests of the child that parental rights be terminated, which the State must prove by a preponderance of the evidence. *Id.* at 495; 705 ILCS 405/2-29(2) (West 2012).

¶ 65     The determinations of parental fitness and the best interests of the child are made in separate hearings, as " 'a single hearing consolidating the issues of unfitness and best interest carries a risk of prejudice.' " *In re D.M.*, 336 Ill. App. 3d 766, 771 (2002) (quoting *In re D.R.*, 307 Ill. App. 3d 478, 484 (1999)). The two hearings focus on different factors. During a parental fitness hearing, the parent's past conduct is under scrutiny but, during a parental rights termination hearing, the focus is on "the child's welfare and whether termination would improve the child's future financial, social and emotional atmosphere." *Id*. at 771-72.

¶ 66                                            1. *Unfitness*

¶ 67     The trial court found respondent was unfit to parent the children for her failure to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2012)) and failure to protect the children from conditions within their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2012)). Respondent argues the State failed to prove unfitness under either ground and the court's findings were, therefore, against the manifest weight of the evidence.

¶ 68     If properly proven by clear and convincing evidence, any one of the grounds enumerated in section 1(D) of the Act is sufficient for a finding of unfitness. *In re D.F.*, 201 Ill. 2d at 495 (citing 750 ILCS 50/1(D) (West 1998) (which provides that a finding of unfitness may be based on "any one or more" of the enumerated grounds)). When, as here, the respondent parent challenges the sufficiency of the evidence, we will reverse a trial court's finding of unfitness only where it is against the manifest weight of the evidence. *Id*. In reviewing the court's determination, we must remain mindful that each case is to be considered and decided on its own unique facts and circumstances. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). The trial court's findings that respondent is unfit to parent Lavelle, Davon and Savana were not against the manifest weight of the evidence.

¶ 69     The extensive evidence previously recited amply supports the trial court's finding that respondent is unfit, both due to her failure to maintain a reasonable degree of interest, concern or responsibility as to Lavelle's, Davon's and Savana's welfare (750 ILCS 50/1(D)(b) (West 2012)) and her failure to protect the children from conditions within their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2012)). Respondent had her first three children removed from her care in 2008 after one of them, one-month-old Trevion, was found

to have a fractured femur that could only have been caused by intentional physical force or a car accident. As expert witness Dr. Heller would testify, since Trevion was never in a car accident, his injury was, therefore, purposely inflicted. Dr. Heller would testify that Trevion would have been "hysterical with pain," yet respondent did not bring him to be treated for a week, leading to the inescapable conclusion that respondent chose to ignore the obvious evidence that Trevion had been hurt. Although respondent admitted she and Enoch were Trevion's sole caretakers, she denied knowing how or when the infant was injured. Necessarily, if respondent did not hurt the child, then Enoch was the perpetrator of the abuse. Yet respondent continued to live with him, bearing four more children, three of whom were also physically abused by Enoch, resulting in the death of eight-month-old Lamar, skull fractures in eight-month-old Lavelle and a rib fracture in 21-month-old Davon. As with Trevion, respondent failed to seek treatment for Lavelle and Davon's injuries despite their evident pain and distress. As before, she claimed no knowledge of how or when these children were injured, even though she and Enoch were the children's sole caretakers and, as Enoch subsequently admitted, he did hit the children.

¶ 70    Respondent showed absolutely no interest, concern or responsibility for Lavelle's, Davon's and Savana's welfare (750 ILCS 50/1(D)(b) (West 2012)) and blatantly failed to protect them from the conditions within their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2012)). She allowed the children to remain in her home with Enoch, a man she knew had hurt one of her other children so severely that he had broken the one-month-old child's leg. She allowed them to be remain exposed to a man who had already physically assaulted their brother and now continually physically assaulted them. Expert witness testimony shows respondent could not have failed to notice the children's pain from their repeated injuries and yet she ignored the children's evident distress and the physical manifestations of their injuries, failed to take them for treatment and consistently denied knowing anything about those injuries or that the children had been injured. Not only did respondent fail to protect her children from Enoch, she consistently showed no interest, concern or responsibility for their welfare at all.

¶ 71    During a fitness hearing, a respondent parent's past conduct is under scrutiny. *In re D.M.*, 336 Ill. App. 3d at 771-72. Here, respondent's past conduct supports the trial court's finding that she was unfit for both her failure to maintain a reasonable degree of interest, concern or responsibility as to Lavelle's, Davon's and Savana's welfare (750 ILCS 50/1(D)(b) (West 2012)) and her failure to protect the children from conditions within their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2012)).

¶ 72    Respondent argues she was denied due process as she had no chance at reunification from the inception of the case since she was not afforded visitation or reunification services and thus could not make progress toward the children's return home. Respondent is correct that the procedure to terminate a parent's rights must comply with the requirement of procedural due process. See *In re J.B.*, 2014 IL App (1st) 140773, ¶ 42. Further, a parent may be found unfit under the Act for failure to make reasonable progress toward the return of the child. 750 ILCS 50/1(D)(m) (West 2012). However, the State did not allege plaintiff was unfit on this basis, alleging instead her failure to maintain reasonable interest or concern in the children's welfare or to protect them from conditions injurious to them. Further, in finding respondent unfit on these two bases, the trial court did not rely on any failure by respondent to visit her children or comply with a reunification service, *i.e.*, on her conduct after the children were removed from

her custody. Instead, it relied on her conduct *before* her children were removed, on the evidence that the children were physically abused by Enoch, that respondent failed to protect them from Enoch and that she sought no treatment or help for their evident injuries and distress. As the court did not base its unfitness finding on any perceived failure by respondent to comply with reunification services or to make progress toward the children's return, respondent's argument is without merit.

¶ 73        Respondent claims "the record is quite clear that [she] was an innocent victim in this tragic case and had no way of predicting that the children could ever be harmed at the hands of their father." From the above litany of evidence, it is quite clear that respondent was anything but an innocent victim. It shows she knew her children were being harmed, failed to protect them, may have participated in the abuse herself and, even if she did not participate, willfully chose to ignore the suffering inflicted on them or get them the help they required. The trial court heard respondent's testimony and, given its unfitness finding, necessarily found her not credible. We defer to that determination. *In re D.F.*, 201 Ill. 2d at 498-99. The record could not be clearer: respondent is unfit to parent Lavelle, Davon and Savana. Accordingly, the trial court's finding that respondent was unfit is not against the manifest weight of the evidence.

¶ 74                                    2. *Best Interests*

¶ 75        The trial court found it was in the best interests of Lavelle, Davon and Savana that respondent's parental rights be terminated. Following a finding of unfitness, the focus of a proceeding on a petition for termination of parental rights shifts to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *Id*. "Although the parent still possesses an interest in maintaining the parent-child relationship, the force of that interest is lessened by the court's finding that the parent is unfit to raise his or her child." *Id*. "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id*. A decision to terminate parental rights in the best interest of the child must be supported by the preponderance of the evidence. *Id*. at 366.

¶ 76        "As this court has recognized, 'once a court has found by clear and convincing evidence that a parent is unfit, the state's interest in protecting the child is sufficiently compelling to allow the termination of parental rights.' " *Id*. (quoting *In re R.C.*, 195 Ill. 2d 291, 308 (2001)). However, the trial court cannot rely solely on fitness findings to terminate parental rights. *In re D.M.*, 336 Ill. App. 3d at 772. Instead, pursuant to section 3-4.5 of the Act, "[t]he court is required to consider factually based statutory factors, separate from those considered during parental fitness hearings, which focus upon 'the child's age and developmental needs.' " *Id.* (quoting 705 ILCS 405/1-3(4.05) (West 2000)).

¶ 77        Section 1-3(4.05) of the Act requires that, "[w]henever a 'best interest' determination is required," the court must consider, in the context of the child's age and developmental needs, the following factors: (1) "the physical safety and welfare of the child"; (2) "the development of the child's identity"; (3) "the child's background and ties"; (4) "the child's sense of attachments"; including "where the child actually feels love, attachment" and "the child's sense of security"; (5) "the child's wishes and long-term goals"; (6) "the child's community ties"; (7) "the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives"; (8) "the

uniqueness of every family and child"; (9) "the risks attendant to entering and being in substitute care"; and (10) "the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2012).

¶ 78 The court may also consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. The trial court's best interest determination need not contain an explicit reference to each of these factors and we need not rely on any basis used by the trial court in affirming its decision. *Id*. "Ultimately, the trial court's final determination regarding a minor's permanency lies within its sound discretion and that decision will not be overturned unless it is against the manifest weight of the evidence." *Id*. ¶ 20.

¶ 79 Here, the record supports the trial court's findings that the State proved by a preponderance of the evidence that it was in Lavelle's, Davon's and Savana's best interests that respondent's parental rights be terminated. It shows that the children clearly did not receive the physical and emotional care from respondent that they required. Davon and Lavelle were physically abused while in respondent's care and, if respondent did not participate in the physical abuse, she either ignored it or did not notice it. She failed to protect her children from Enoch and the effects of his violence toward them and their siblings. She ignored or did not notice Lavelle's evident skull swelling and Davon's weeks-long evident and inconsolable distress from the pain of his broken rib. Davon and Savana were so traumatized by their time in respondent's household that, even though they were very young, they suffered night terrors and were unable to sleep for nights at a time. 21-month-old Davon was traumatized to the extent that he "acted out" by banging his head into the floor. Only after extensive and ongoing trauma therapy and time in a stable foster home did the children improve. They had been with their foster families for two years, were attached to their new families, loved and doing well. The trial court's findings that it was in the children's best interests that respondent's parental rights be terminated were not against the manifest weight of the evidence. The court did not abuse its discretion in terminating respondent's parental rights.

¶ 80 C. Denial of Supervised Visitation

¶ 81 Respondent next argues the court abused its discretion in denying her request for visitation with the children. Section 2-23(3) of the Act provides that the court may enter a dispositional order regarding visitation. 705 ILCS 405/2-23(3) (West 2012). Although a dispositional order entered in a proceeding under the Act is a matter committed to the sound discretion of the trial court, our review of such an order must be made in light of the purposes and policies of the Act. *In re Beatriz S.*, 267 Ill. App. 3d 496, 500 (1994). "The overriding purpose of the Act to which all other goals are subordinate is the 'best interest' of the minors involved."[4] *Id*. To that end,

---

[4]As set forth previously, section 1-3(4.05) of the Act requires that, "[w]henever a 'best interest' determination is required," the court must consider, in the context of the child's age and developmental needs, the following factors: (1) "the physical safety and welfare of the child"; (2) "the development of the child's identity"; (3) "the child's background and ties"; (4) "the child's sense of attachments"; including "where the child actually feels love, attachment" and "the child's sense of security"; (5) "the child's wishes and long-term goals"; (6) "the child's community ties"; (7) "the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives"; (8) "the uniqueness of every family and child"; (9) "the

section 1-3(13) of the Act provides that the right to reasonable visitation remains with a parent after the transfer of legal custody or guardianship of a child but that right " 'may be limited by the court in the best interests of the minor as provided in subsection (8)(b) of this Section.' "[5] *In re Taylor B.*, 359 Ill. App. 3d 647, 650 (2005) (quoting 705 ILCS 405/1-3(13) (West 2004)). We will reverse a trial court's dispositional determination, in this case regarding visitation, only if the court's findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *Id.*

¶ 82    The court initially barred respondent from seeing Lavelle, Davon and Savanna on December 14, 2012, entering a no-contact order. Respondent has not included a report of these proceedings in the record. Respondent, as the appellant, has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In the absence of such a record on appeal, we will presume that the order entered by the trial court was in conformity with law and had a sufficient factual basis and resolve any doubts arising from the incompleteness of the record against respondent. *Id.* at 392. As there is no transcript of the hearing on respondent's first request for visitation, there is no basis for holding that the trial court abused its discretion in denying such visitation in December 2012.

¶ 83    The court subsequently barred respondent from seeing her children in April 2014, when it denied her motion for supervised visitation. The record supports the court's finding that granting supervised visitation to respondent, who allowed her children to be beaten, willfully or ignorantly failed to notice their injuries and pain, failed to provide them the help they required and consistently refused and, indeed, still refuses to accept any responsibility whatsoever for what happened to her children, was not in the best interests of the minors. This is especially evident given LSSI caseworker Holmes' testimony during the hearing on the motion that Davon and Savana, who were not even two and three years old at the time, were so traumatized by their life with respondent that they suffered night terrors daily for over a month, Davon exhibited head banging, both children required specialized trauma therapy and their emotional state had improved only after being removed from respondent's care for over a month. As a result of the physical abuse and lack of care the children suffered and/or witnessed, they have, as the trial court noted, "serious, serious emotional and psychological problems." It was the opinion of LSSI, the agency charged with their care, that even though the children's mental state had improved since being removed from respondent's home, they would be retraumatized during a supervised visit with respondent. Accordingly, the court's ruling that it was not in the children's best interests to allow visitation was not against the manifest weight of the evidence, and it did not abuse its discretion in entering the order denying supervised visitation. To quote an earlier decision of this court, "[i]n support of our conclusion, we cite but two sources: the record in this case and simple common sense." *In re*

---

risks attendant to entering and being in substitute care"; and (10) "the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2012).

[5]Section 1-3(8)(b) provides that a guardian's duty and authority regarding a minor are "subject to residual parental rights and responsibilities" including "the authority and duty of reasonable visitation, *except to the extent that these have been limited in the best interests of the minor by court order*." (Emphasis added.) 705 ILCS 405/1-3(8)(b) (West 2012).

*Beatriz S.*, 267 Ill. App. 3d 496, 500 (1994).

¶ 84                                                                  D. Admission of Evidence

¶ 85        Respondent lastly argues the court erred in allowing Dr. Glick to testify that Lavelle's injuries were "relatively fresh and a couple of days of age" and that the caregiver of a child with a broken rib would notice the injury, claiming these opinions were not previously disclosed pursuant to Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007). "The decision of whether to admit or exclude evidence, including whether to allow an expert to present certain opinions, rests solely within the discretion of the trial court ***." *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 36-37 (2010). We will not reverse the trial court's admission of evidence absent an abuse of that discretion, where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 86        Rule 213 provides for the timely disclosure of expert witnesses and their opinions in order to avoid surprise and discourage strategic gamesmanship. *Id.* at 37. Its disclosures are mandatory and strict compliance is required. *Id.* In the State's answer to respondent's Rule 213 interrogatories, it disclosed Dr. Glick as both a lay witness and an independent expert witness. Rule 213(f)(2) requires the disclosure of the subjects on which the independent expert witness will testify and the opinions the party expects to elicit from that witness. *Id.*; Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2007). Rule 213(g) limits expert opinions at trial to the information disclosed in answer to a Rule 213(f) interrogatory or at deposition. *Cetera*, 404 Ill. App. 3d at 37; Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). However, a witness may elaborate at trial " ' "on a disclosed opinion as long as the testimony states logical corollaries to the opinion rather than new reasons for it." ' " *Cetera*, 404 Ill. App. 3d at 37 (quoting *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 812 (2009), quoting *Foley v. Fletcher*, 361 Ill. App. 3d 39, 47 (2005)).

¶ 87        During the State's direct examination of Dr. Glick during the adjudicatory hearing, respondent objected to Dr. Glick's testimony that Lavelle's injuries were "relatively fresh and a couple of days of age," arguing this opinion had not been disclosed. The court overruled the objection, finding it was not a new opinion. We agree. In the State's answer to respondent's Rule 213 interrogatories, it identified the subjects on which Dr. Glick would testify and the opinions it expected to elicit from her as: "see MPEEC Report, Curriculum Vitae, and University of Chicago Comer Children's Hospital records already tendered to counsel for Respondent-Mother."[6] In the MPEEC report, Dr. Glick stated her opinion that Lavelle "sustained acute blunt trauma due to swelling noted on CT and exam over the fractures. Acute in medical terminology indicates the injury was recent due to the swelling noted." In her diagnosis recorded in Lavelle's Comer Children's Hospital medical record, she stated: "The fractures are recent in that there is swelling over them on exam."

¶ 88        At trial, Dr. Glick testified that, based on the "bogginess and swelling" of Lavelle's skull fractures, "they would have occurred within a couple of days of being seen at Comer because the swelling indicates relatively new and fresh injury." She stated she could not comment on "exactly how old" Lavelle's injuries were but could say "those are relatively fresh and a couple of days old." Dr. Glick's testimony that Lavelle's skull fractures were "a couple of days old" was not a new opinion. It was an elaboration on her disclosed opinion that Lavelle's injuries

_____

[6]The "MPEEC report" is the report Dr. Glick wrote in her role as the medical director of the Child Protective Services Team in which she summarized her findings regarding all three children.

were "acute" and "recent," as she had stated in her previously disclosed MPEEC report and diagnosis in Lavelle's medical record. If an injury is "a couple of days" old, that injury is recent. "The testimony at trial must be encompassed by the original opinion." *Foley*, 361 Ill. App. 3d at 47. Dr. Glick's testimony that Lavelle's skull fractures were "relatively fresh and a couple of days of age" was clearly encompassed by her disclosed opinions that his fractures were "acute" and "recent."

¶ 89    Respondent had also objected to Dr. Glick's testimony, given in the context of Davon's rib fracture, regarding what a caregiver of a child with a broken rib would notice about the child, arguing the opinion was vague and undisclosed. After the court overruled the objection, Dr. Glick testified that "[a] child with a rib fracture will be in pain and have discomfort," would be uncomfortable with every deep breath and bowel movement, irritable, fussy, inconsolable and, unlike most children in pain, would not want to be held because it would hurt. In other words, the child's pain would be evident to a caregiver, leading to the inference that respondent could not have failed to notice Davon's pain. This opinion is encompassed in Dr. Glick's MPEEC report, in which she stated:

> "[Davon's] rib fracture is diagnosed as an occult injury; there is no history to my knowledge that this child has been seen for an injury. I let DCFS know that if there was a history for this injury that is a corroborated history where the child was seen by a doctor for pain, (rib fractures hurt with movement) that we could readdress my opinion."

Dr. Glick had previously explained in her report, in the context of Lavelle's injuries, that " 'occult' that is a parent had not sought care for a known fall or impact." She stated Davon's "old healing fracture" was "highly suspicious for abuse" given Lamar's death, Lavelle's skull fractures and the fact that his own injury was occult, *i.e.*, untreated because his parent had not sought care for the injury. These disclosed opinions that "rib fractures hurt with movement" and that Davon's fracture was occult, meaning no parent had brought him in for treatment for his evident pain, encompassed her subsequent testimony that his pain would be evident to respondent, his caregiver, who had not brought him in for medical care.

¶ 90    Respondent further claims the State was required to disclose the basis for each of Dr. Glick's opinions. However, this requirement pertains only to controlled expert witnesses, not to independent expert witnesses such as Dr. Glick.

> "A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and *the bases* therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." (Emphasis added.) Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).

Dr. Glick was not a controlled expert witness. Instead, she was "a person giving expert testimony who is *not* the party, the party's current employee, or the party's retained expert" and thus an "independent expert witness" as defined in Rule 213(f)(2). (Emphasis added.) Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2007). Rule 213(f)(2) requires only that, "[f]or each independent expert witness, the party must identify the subjects on which the witness will testify and the opinions the party expects to elicit." *Id*. Accordingly, as Dr. Glick was an independent expert witness, the State was not required to disclose the bases for her opinions.

¶ 91    Respondent also argues that the trial court erred in not allowing her to cross-examine Dr. Glick regarding where the children were before her examination and how long they were there. She makes this argument in two repetitive sentences without citation to legal authority or explanation of how she was prejudiced by the alleged error. The argument is, therefore, forfeited. *In re Estate of Michalak*, 404 Ill. App. 3d at 90.

¶ 92    Accordingly, as the State's disclosures regarding Dr. Glick's testimony and opinions were sufficient to comply with the requirements of Rule 213(f)(2) for the disclosure of independent expert witnesses, the trial court did not err in allowing Dr. Glick's testimony.

¶ 93                                    III. CONCLUSION

¶ 94    For the foregoing reasons, we affirm the orders of the trial court.

¶ 95    Affirmed.