No. 2-19-1066
Order filed April 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* E.J., A Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No.   16-JA-74 |
| | ) | |
| (The People of the State of Illinois, Petitioner-Appellee, v. Edward B., Respondent-Appellant). | ) | Honorable |
| | ) | Mary Linn Green and Francis M. Martinez, |
| | ) | Judges, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Bridges and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's fitness and best-interests findings were not against the manifest weight of the evidence or an abuse of discretion.  Affirmed.

¶ 2   Respondent, Edward B., appeals from the trial court's orders finding him unfit to parent his daughter, E.J., and terminating his parental rights.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4   E.J. was born on January 6, 2015.  On March 9, 2016, the State filed a three-count neglect petition, alleging that E.J. was abused and/or neglected based on allegations that both parents had engaged in domestic violence.  A DCFS report, dated March 18, 2019, related that, in December 2015, Edward forced his way into E.J.'s mother's (S.J.'s) home and battered her with an aluminum

baseball bat in front of one of S.J.'s other children. S.J. reported several prior incidents with Edward, including four days earlier that resulted in a broken hand and left her neck in a brace. She did not currently have an order of protection against him, but had numerous emergency orders in the past. Edward had two domestic battery warrants outstanding for violence against S.J. DCFS requested that temporary custody of E.J. be granted to it based on the parents' history of domestic violence and S.J. having contact with Edward and refusing to work with the agency and law enforcement. After a March 18, 2016, shelter care hearing, which was held in Edward's absence, the trial court granted DCFS temporary custody of E.J.

¶ 5     Edward was incarcerated on April 2, 2016, in the Winnebago County jail. E.J. was placed in a relative's home.

¶ 6     An adjudication hearing was held on May 25, 2016. Edward was present. By stipulation of the parties, E.J. was adjudicated an abused or neglected minor.

¶ 7     In an August 2, 2016, dispositional order, the court ordered further guardianship and custody to DCFS. At this time, Edward was still incarcerated in the Winnebago County jail. He apparently completed a parenting class while in jail.

¶ 8     A November 8, 2016, DCFS report stated that Edward was incarcerated at the Illinois River Correctional Facility, serving a four-year sentence for unlawful restraint. His parole date was September 15, 2017. At this time, E.J. lived in the home of her paternal half-sister.

¶ 9     An integrated assessment filed on January 30, 2017, stated that Edward, age 46, minimized his responsibility for why his family was involved with DCFS and denied that he engaged in domestic violence in his romantic relationships. He asserted that he was the victim of physical aggression in prior relationships, reported that his girlfriends charged him with perpetrating physical aggression, and denied he perpetrated physical aggression. He admitted that he had "lots"

of orders of protection against him. Edward also had substance abuse problems, including using cocaine. Due to several risk factors, the evaluator was concerned about him perpetrating future violence. He self-reported the following criminal history: mob action at age 15 (related to his gang involvement); domestic battery at age 20; drug possession at age 26 (four times, resulting in a sentence of three years' imprisonment); multiple charges for domestic violence, which he denied and one for which he pleaded guilty to unlawful restraint. Edward reported that he turned himself into police on April 2, 2016, for active warrants related to domestic violence charges. He initially denied using corporal punishment to discipline his children, but later admitted to an incident in which he hit his older son with a belt in the bathtub. Addressing E.J., the report stated that she "presented as a significantly underweight, content infant." She was exposed to alcohol in utero, was born at 26 weeks' gestation, and was on a breathing tube for two months.

¶ 10    At a January 30, 2017, permanency review, Edward was found to have made reasonable efforts.

¶ 11    A February 27, 2017, DCFS family service plan stated that Edward had taken classes while in prison and was awarded a certificate of completion for an anger management class. The recommendations included individual psychotherapy, substance abuse assessment and random urine screenings, domestic violence screening, parenting classes, and vocational education and training. Edward had written to the caseworker, requesting visits with E.J.

¶ 12    An August 24, 2017, family service plan addressed supervised visits and noted that E.J. visited Edward in court. He played with her and was "very appropriate" during the visit. He was writing the caseworker monthly, requesting information on E.J. and had completed several classes: parenting I, parenting II, anger management, relationships and interpersonal coping skills group, managing mental health and substance abuse issues, and an anxiety management group.

¶ 13    Following a permanency review, the trial court found, on August 25, 2017, that Edward had made reasonable efforts, but not reasonable progress.  The court set the case for a permanency review on November 13, 2017.

¶ 14    A November 3, 2017, DCFS permanency report to the court stated that Edward had been released from prison on September 15, 2017, and went to a Salvation Army halfway house in Chicago, where he was on house arrest.  At the end of October, he was able to parole to his brother's residence in Rockford, but was still on house arrest, with limited movement.  He was referred for domestic violence services, and the agency was trying to secure an appointment for a substance abuse assessment.  E.J., age two, was in traditional placement and receiving developmental services in the home.  Weekly visits for Edward were to start on November 11, 2017.  E.J. was in her third placement, in traditional foster care, was doing very well, and was thriving in that placement.  DCFS assessed Edward as making satisfactory progress and reasonable efforts.

¶ 15    On November 13, 2017, the court found that Edward had made reasonable efforts, but deferred a reasonable progress finding.  (DCFS had asked for a deferred finding, given Edward's recent release from prison and limited time to attempt to make reasonable progress.)

¶ 16    A December 2017 domestic violence assessment stated that Edward reported that he had been diagnosed with bipolar disorder and paranoid schizophrenia.  He had been in therapy on and off for years.  He felt depressed, isolated, had trouble sleeping, and continued to hear voices.  Edward had not completed high school or earned a GED.  His primary income since 1999 had been social security disability benefits (due to his substance abuse and, then, for his mental illnesses (since 2008)).  He reported that he had six children with three different women.  The

evaluator recommended individual therapy and cognitive distortion group, given Edward's extensive history of trauma, violence, and his lengthy history with the criminal justice system.

¶ 17    A February 2018 DCFS permanency report to the court stated that Edward had moved to the Rockford Rescue mission and was referred for domestic violence services. He completed a substance abuse assessment, and no services were recommended. He was in the process of obtaining mental health services. He was diagnosed with bipolar disorder and paranoid schizophrenia. Addressing visitation, the report stated that Edward missed a visit with E.J. due to a last-minute change in his living arrangements. The agency assessed that Edward had made satisfactory progress and reasonable efforts.

¶ 18    A February 7, 2018, DCFS family service plan stated that Edward had maintained contact with DCFS, completed his assessments, was waiting for his medical card to be approved so he could start services, and had regularly attended visits. At the weekly visits, Edward read to E.J., maintained appropriate communication, behavior, and discipline and was nurturing. He had been cooperative with DCFS and completed all assessments.

¶ 19    An April 30, 2018, DCFS permanency hearing report to the court stated that Edward had made satisfactory progress and reasonable efforts towards his goals. Edward had started mental health services, after a delay due to his insurance. He was working at a peanut factory and applied for social security benefits. E.J. was in daycare and doing well and was referred for play therapy. During visits, Edward was very loving and nurturing toward E.J. He brought snacks, got on the floor to play with her, read to her, and tended to all her needs.

¶ 20    At a May 7, 2018, permanency review, the trial court found that Edward had made reasonable efforts and reasonable progress.

¶ 21   A July 27, 2018, permanency report to the court stated that Edward had made satisfactory progress and reasonable efforts.  He completed mental health services and continued to participate in ongoing counseling.  His therapist reported that he was very engaged, had no unexcused absences, maintained contact with the therapist and case manager, and was very insightful and cooperative during sessions.  His only barrier to reunification was his housing.  Edward was on the waitlist with the Rockford Housing Authority.  E.J. was flourishing developmentally, and she attended daycare and loved being there and playing with her friends.  Her vocabulary and speech had greatly improved.  In August, Edward would move to two visits per week.  He had missed one visit due to having a housing appointment.  E.J. was in her fourth placement, in traditional foster care.

¶ 22   An August 8, 2018, Rosecrance progress note contained a letter addressed to Edward, wherein Jacoda Barger, mental health clinician, stated that he was being sent the letter "due to loss of contact or failed appointments."  Records reflected that Edward had not yet attended a "WRAP" group and that his last service was on July 16, 2018.  Barger noted that she had been unable to contact Edward via phone.

¶ 23   However, a September 10, 2018, letter from Barger stated that Edward sought mental health services in November 2017.  He began services in December 2017.  At the time, he did not have insurance and was eligible only for case management.  Upon receiving insurance, Edward began additional services.  Since their commencement, he had actively participated in services, reported reductions in symptom severity/frequency, increased stability, and successfully regulated his emotions and managed conflict.  He had been proactive in staying engaged in services and successfully completed the wellness and recovery community support group.  He appeared to have

obtained control of his mental health symptoms and reported maintained stability for a significant period.

¶ 24 On November 5, 2018, the trial court found that Edward had made reasonable efforts but not reasonable progress. Edward was not present at the hearing. It was noted that he was employed, but continued to have housing and visitation issues.

¶ 25 A September 2018 DCFS family service plan stated that Edward was diagnosed with depression. He was released from parole on September 15, 2018. Edward had lived between his brother's residence and the Rockford Rescue Mission. He was unemployed, worked odd jobs, was waiting for disability benefits to be approved, completed mental health services, and needed housing. Edward had regularly attended weekly visits, but, after he had been scheduled for two weekly visits, he missed all of the extra visits, "but part of that was due to a conflict with Rosecrance." He "need[s] to be consistent as he is in the home stretch and visits need to increase in order for [E.J.] to return home." Edward was required to attend 90% of visits. E.J. was doing very well.

¶ 26 A November 2, 2018, permanency report to the court stated that the caseworker had spoken to Edward's therapist, who reported that he had not been on his medication and had asked for a referral to see a psychiatrist to get back on it. He was consistent in participating in mental health services and was open to participating in groups "and whatever he can to ensure his stability so that he can have [E.J.] returned to his care." Edward was offered a job at Rockford Rescue Mission and was working on obtaining housing. The only area of noted concern was visitation. After the agency increased visits in September to twice per week, Edward attended only one visit per week and the agency went back to one visit per week. He missed visits due to a variety of reasons, including a job interview, doctors' appointments, and a misunderstanding with the transportation

provider. The agency stated that Edward needed to be more consistent with visitation so that visits could increase, such that E.J. could be returned to his care. Once visits increased, DCFS would refer Edward to parent coaching. E.J., age three, had been in her traditional placement since May 2018 and was in daycare and doing "extremely well." She flourished in her placement. She was screened for preschool and had no delays. She was in a home that was willing to adopt her. Edward was "very hands on" during visits, took care of all of E.J.'s needs during the visits, and E.J. had a visible bond with him and looked forward to the visits. During some visits, approved members of Edward's family visited E.J. as well. The agency recommended that Edward acquire stable income and acquire housing. Further, visitation needed to be consistent to increase visits and eventually move to unsupervised visits.

¶ 27 A November 9, 2018, Rosecrance plan of care for Edward stated that Edward reported that he experienced visual and auditory hallucinations.

¶ 28 A January 31, 2019, letter from Rosecrance mental health clinician Jacoda Barger, written to advocate on Edward's behalf to receive housing assistance, stated that Edward sought services in November 2017 and received an assessment. It was determined that he would benefit from outpatient services. He had been compliant and consistent and was proactive about staying engaged in services. He successfully completed the wellness and recovery community support group on July 16, 2018. He actively participated in services since their commencement, reported reductions in symptom severity/frequency, increased stability and functioning, and an ability to successfully regulate his emotions and manage conflict. He appeared to obtain control of his mental health symptoms and reported maintained stability for a significant period. Edward had also, the letter stated, maintained his employment for several months. Barger opined that Edward

was a rehabilitated person and would benefit from housing assistance so that he could provide a healthy environment for his daughter.

¶ 29    A March 4, 2019, family service plan stated that E.J., age three, was in Loves Park and was doing very well. Her daycare provider reported that she had grown developmentally. As to Edward, the plan listed his criminal background as follows: one conviction for dangerous drugs; 2 orders of protection; and one conviction for assault. Edward was required to attend 90% of visits, but he was making unsatisfactory progress. Once his visits were reduced to once per week, he continued to be inconsistent. The agency rated the goal of return home within 12 months, as well as the goal of visitation, as unsatisfactory, noting that Edward was not regularly attending visits.

¶ 30    A DCFS permanency hearing report for E.J., filed on April 2, 2019, rated Edward as not making satisfactory progress or reasonable efforts. Edward had completed outpatient managing self-awareness group and continued to participate in individual therapy and case management. He continued to struggle with stability in that he was not working. He reported that he obtained housing, but had not scheduled a visit for DCFS to tour his new home. Edward had only five successful visits since November 1, 2018. E.J., age four, had been in her traditional placement since March 2018, was in daycare, and doing "extremely well." She was flourishing in her placement and was in a home that was willing to adopt her.

¶ 31    At an April 29, 2019, permanency review, the trial court found that Edward had made reasonable efforts, but not reasonable progress. Edward was not present at the hearing. The foster mother and Charles Ward, the caseworker, testified. It was noted that Edward had attended only five visitations since November 2018 and that he had been made aware of a cardiology appointment for E.J., but did not attend the appointment. E.J., it was further noted, was flourishing

in her foster placement. The goal was changed to substitute care pending termination of parental rights.

¶ 32    On May 16, 2019, the State moved to terminate Edward's parental rights to E.J., asserting, in a subsequent, amended motion, that he was unfit in that he: (1) had failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) had failed to make reasonable progress toward the return of the child to him during a nine-month period after an adjudication of neglected or abused minor under section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2018)) or dependent minor under section 2-4 of the Act (705 ILCS 405/2-4 (West 2018)) (750 ILCS 50/1(D)(m)(ii) (West 2018)) for the periods August 25, 2017 to May 25, 2018, and/or December 10, 2017, to September 10, 2018, and/or July 29, 2018, to April 29, 2019; and (3) is depraved (750 ILCS 50/1(D)(i) (West 2018)).

¶ 33    A May 22, 2019, Rosecrance plan of care stated that Edward had reported that he "experiences auditory and visual hallucinations, feeling of overwhelm, depressed mood, racing thoughts, lack of focus and concentration, mood swings 'sometimes,' and tendency to isolate and avoid."

¶ 34    In a June 25, 2019, report to the court, DCFS stated that Edward continued to struggle with stability in that he did not consistently work. He had recently moved into a Rockford Housing Authority apartment. E.J., age four, was flourishing in her placement. DCFS recommended that the case move to a termination hearing.

¶ 35    A July 17, 2019, DCFS report to the court stated that the main concerns were Edward's inability to maintain stable housing and income and his "very inconsistent" visitation (he had cancelled or missed about one-half of his visits). The report further stated that Edward "is very

angry with this worker due to the impending termination and has since stopped contacting DCFS." E.J. had no issues since the last court date. The report stated that she was healthy and doing well, and her caregivers had ensured that her needs were met. DCFS recommended that Edward be found unfit and that the goal be changed to adoption. E.J., the report stated, had a significant emotional attachment to the prospective adoptive parents and their extended family, felt comfortable and happy in the home, and "fit seamlessly" there. She loved her daycare, had friends there, and participated in extracurricular activities. The foster parents were committed to maintaining E.J.'s relationship with her siblings.

¶ 36    A September 10, 2019, family service plan noted that Edward had made unsatisfactory progress in demonstrating appropriate parenting techniques during visits, where he was inconsistent with visitation and "still making poor parenting choices." He was also rated unsatisfactory as to maintaining a positive relationship with E.J., where his visits had been reduced to twice per month.

¶ 37                                   A. Fitness Hearing

¶ 38    On July 25, 2019, the fitness hearing commenced. Charles Ward, the caseworker, testified that he had been the DCFS caseworker on this case since January 16, 2019. At that time, Edward had completed all services, except for obtaining housing. He was also enrolled in Rosecrance for mental health treatment, on his own. Visits were on a weekly basis, for two hours, and they were supervised. There were issues of trust that prevented Edward from being able to provide the necessary safety and security; thus, the visits were supervised. He was not participating in consistent visitation, and Edward's relationship with E.J. was not on a "solid footing" as a result. There were also several occasions when Edward brought other visitors to visits who were not

previously approved by the agency and without requesting permission to do so. This created safety issues. DCFS needed to do background checks and approve the visitors.

¶ 39    Ward further testified that the agency could not place children with someone who does not have stable housing; this prevented movement toward placement with Edward. However, Edward obtained suitable housing within the six months prior to the hearing. Ward checked the home, and it was appropriate.

¶ 40    Addressing visitation, Ward stated that, since January 2019, Edward attended about 50% of the scheduled weekly visits. Some missed visits were due to issues with work, per Edward. One of the unapproved people whom Edward brought to visits was his son (who also brought his daughter or granddaughter) and another was his girlfriend. DCFS did not allow visits to occur at Edward's home, because of the inconsistency in visitation, the fact that the goal had been changed to substitute care pending termination of parental rights, and the fact that it might be confusing for E.J. As to the visits that actually occurred, they were generally appropriate. There was one occasion when E.J. ran through a sprinkler, became wet, and had no change of clothes. Ward testified that the purpose of the visits are to increase the bond between the parent and child and to learn parenting skills. These purposes cannot be achieved if the parent does not attend visits. He also noted that certain Rosecrance records were misleading or incomplete.

¶ 41    The hearing continued on August 29, 2019. Edward was present. Jacoda Barger, a mental health clinician at Rosecrance Ware Center, testified that Edward was her client. She saw him weekly or biweekly, and he attended a 12-week wellness group, which he successfully completed. Since March 2018, Barger worked with Edward on his attitude, healthy communications, conflict management, and being able to use community resources. They focused on coping skills and being able to get through daily life without mental health symptoms getting in the way. They discussed

preparing for the future, too. Edward, in her view, was good at advocating for himself. He obtained an apartment and found employment. Schizophrenia is the primary diagnosis, but it rarely came up. The main focus, according to Barger, has been depression. Barger has seen progress with Edward's depression; he was motivated and energized. She conceded that there were times when Edward was inconsistent with his participation in mental health services. The hearing was continued.

¶ 42    In an October 4, 2019, DCFS report to the court, the agency stated that, since the goal was changed, Edward had become "much more consistent with his visits." He visited once per week for one hour. In a November 7, 2019 report to the court, DCFS stated that Edward was visiting twice per month for one hour.

¶ 43    The hearing continued on October 11, 2019. Edward was present. Tereza Stacey, a DCFS caseworker, testified that E.J. was part of her caseload from April 2016 through January 2019. Initially, Edward was incarcerated and there was one visit during that time. Once he was released, he had supervised visitation once per week. There were "spurts" when Edward regularly attended visits. Just before Stacy left, the agency decreased his visits, because he had missed many and E.J. would get upset when Edward missed a visit. In the fall of 2019, the agency increased the number of hours of visits per week (to twice per week, three hours each). But, again, they were ultimately decreased due to missed visits. Edward did not have any documentation or information that would have caused the missed visits to be excused. Even after they were reduced, his attendance was not consistent. During the time she was his caseworker, Edward never acquired appropriate housing for E.J. to be returned to him, nor did he have a source of income such that he could pay for his expenses. Stacy never moved toward placement of E.J. with Edward, because he had not completed services, obtained housing, and had inconsistent visits.

¶ 44 Stacy further testified that, during the following periods, she was not able to take steps to return E.J. to Edward's care of increase visitation: August 25, 2017, to May 25, 2018; and December 10, 2017, to September 10, 2018. Near the end of her time as his caseworker, Edward was missing more visitations than he was attending.

¶ 45 When she first got the case, Edward engaged in and completed a parenting class. He maintained communication with Stacy during the time she was his caseworker. He completed a domestic violence evaluation and a substance abuse evaluation (no treatment recommended). Subsequent to becoming incarcerated, Edward did not engage in any illegal activities of which the agency became aware. He participated in random drug screens, which were all negative. He did not engage in any actions such that domestic violence remained a concern. Edward showed appropriate care and concern for E.J. Between August 2017 and May 2018, there no steps toward the return home of E.J. Edward was always appropriate during visits. He missed some visits due to doctors' appointments and for temporary employment agency commitments.

¶ 46 Edward testified that he was in custody from April 2016 to September 15, 2017 (for unlawful restraint, a domestic-violence offense). During his incarceration, he requested visitation, but it was never granted. Edward stated that he completed anger management classes while in the Department of Corrections and parenting classes, mental-health, and domestic violence classes while in the Winnebago County jail. He maintained contact with his caseworker. Edward was released to a halfway house, and he took a bible study class there. Later, he was paroled to his brother's house in Rockford. He lived there from mid-October 2016 to December 15, 2017. He began visitation on November 10, 2017, at two hours per week. He also started mental health services at this time, as his insurance coverage became effective. According to Edward, he was not asked to engage in parenting classes or substance abuse services, but he was asked to complete

domestic violence services. He underwent an evaluation at Clarity, which resulted in a recommendation to engage in services at Rosecrance.

¶ 47    After Edward moved out of his brother's home in December 2017, he lived back and forth between his girlfriend's home and the Rescue Mission (through March 2018). He attended all visitation at this time. He completed his mental health and individual counseling services at Rosecrance in June or July 2018, and he had returned to live at his brother's house in May 2018. Edward obtained employment on November 26, 2018 (at Goodwill). (Prior to that, he worked odd jobs.) He worked there until March 8, 2019, when his assignment ended. Edward lived with his brother until March 22, 2019. Edward explained that his brother's home was not appropriate for E.J. to return to because his brother's son is autistic and unpredictable. He did not trust him around E.J. Edward had worked with the St. Elizabeth Center, via the unemployment office, to search for employment. Edward further testified that the visits he missed were due to him trying to find employment or hospital visits.

¶ 48    Between March and April 2019, Edward obtained employment through a temporary agency. He estimated that the attended about 50% of all scheduled visits, until they increased to twice per week in December 2018. He had issues with transportation and affording food for E.J. He expressed his concerns to Stacy, but was told that he had to get through a number of supervised visits twice per week in order to be offered unsupervised visits. The twice-per-week visits were scheduled for about one month. He asked to increase his visits again, but the caseworker was leaving the case around this time.

¶ 49    Edward moved into his own apartment in March 2019. He asked caseworker Ward to do a home safety check, but was told that it was too late. In August 2019, he started working at Fisher in Elgin. Edward testified that he was never asked to do anything other than the mental health

evaluation and services that he was engaged in, find employment, find housing, and visitation. Obtaining housing was difficult due to his inability to find employment; also, he was on a waitlist.

¶ 50    E.J. was born premature.  Edward visited her every day in the hospital until she was discharged.  Edward turned himself in when E.J. was taken into custody by DCFS.  He had been wanted on a warrant for two months.  Prior to April 2016, Edward took E.J. to about six doctor's appointments.  Between April 2016 and October 2019, Edward did not take E.J. to any doctor's appointments.  He provided food and seven or eight outfits during visits (through October 2019).

¶ 51    Edward missed his weekly mental-health appointment at Rosecrance on December 15, 2017.  He could not recall if he had missed about 11 others he was asked about.  He acknowledged that he received a letter from Barger on August 8, 2018, stating that he had several missed appointments and that she was concerned about his treatment.  When asked about 15 subsequently-scheduled appointments, Edward responded that he could not recall if he missed them.  He was supposed to have weekly appointments for 12 weeks.  He spoke to Barger every two weeks.

¶ 52    On December 2, 2019, the trial court found Edward unfit on all bases alleged in the State's motion.  The court noted that there were continuing problems with Edward obtaining stable housing, he never graduated to unsupervised visitation, and his visitation was not consistent.  The court also noted that Edward brought unapproved persons to the visits.  Further addressing visitation, the court found that Edward attended about 50% of visits that were scheduled on a weekly basis.  The medical records, the court found, showed that Edward had periodic auditory and visual hallucinations.  The court noted Stacy's testimony that E.J. became upset when Edward missed visits.  After the visits were increased to twice per week in the fall of 2018, his attendance was not consistent and the visits were reduced to once per week again.  The court also noted Stacy's

testimony that, by 2019, Edward wanted to see a psychiatrist to get on medication to help him stabilize. Edward, the court found, lived with E.J. for only six months of her life.

¶ 53    Addressing count I, the court found that the State proved that Edward failed to maintain a reasonable degree of responsibility as to E.J.'s welfare. As to count II, the court found that the State established that Edward failed to have E.J. successfully returned to him, in that he failed to make reasonable progress at the permanency reviews on: August 25, 2017, November 5, 2018, and April 29, 2019. Finally, as to count III, the court found that the State proved that Edward was unfit in that he was depraved. The court listed Edward's criminal history and noted that it was unrebutted.

¶ 54                              B. Best Interests Hearing

¶ 55    The case proceeded to the best-interests hearing. Caseworker Ward testified that E.J. is placed in a traditional foster home. He visits the home or her daycare once per month. E.J. sees her foster parents as her parents. She is comfortable in the home, has lots of toys, and has a strong bond with the foster parents, especially the foster mother. The foster father is often away for a week at a time on business. However, Ward observed him three or four times in the last 10 or 11 months, and he is a father figure. Ward observed playful and affectionate interaction between E.J. and the foster mother such as you see with a mother and daughter.

¶ 56    Addressing community ties, Ward testified that E.J. has the school/daycare, a counselor at Hope Counseling, she interacts with her brother, G., in Rockford (they sometimes have sleepovers), and she does Skype/Facetime with her four siblings in Chicago (or goes on sibling visitation). The foster parents are supportive of maintaining the relationships with E.J.'s siblings.

¶ 57　E.J. has been in her foster home for about two years. She is developmentally on target. The foster family incorporates E.J into their extended family and family celebrations. The foster parents also host foreign exchange students, whom E.J. has gotten to know.

¶ 58　Ward had not observed E.J. with Edward, but reviewed the case visitation notes. In his view, there was a difference in the relationship between the foster parents and Edward. Ward testified that one of the concerns he had was that all of the visits had been in the community, either at Burger King, parks, or other local areas. He explained that the ability to have a parent-child relationship is difficult in those environments. There have also been questions about Edward's parenting decisions, noting the incident when E.J. ran through a sprinkler and had no change of clothes. Ward also expressed concern about the nutritional value of the food at Burger King. He also noted that, sometimes, Edward would buy E.J. too much food, reflecting his lack of knowledge of how much a four-year-old eats. As to counseling and any other needs E.J. had, Ward stated that the foster parents had met those needs. The agency recommended that it was in E.J.'s best interests that Edward's parental rights be terminated and that the foster parents be allowed to adopt E.J.

¶ 59　On cross-examination, Ward testified that the foster parents reported some concerns after Edward's increased attendance at visitation since the goal change, specifically, that E.J. was regressing in potty training and an increase in her anxiousness that she was addressing in counseling. Edward missed two or three of these visits and provided no documentation addressing the reasons. Ward further testified that since the goal was changed, Edward was not returning his calls on a consistent basis.

¶ 60　Ward also stated that visitation was scheduled following the unfitness hearing. Court proceedings concluded at around 4 p.m. that day, and visitation was scheduled for 5 p.m. Edward requested that the visitation be changed, because he had an (undocumented) eye doctor's

appointment at 4:30 p.m. When Ward pointed out that Edward could not make it on time for his appointment and that they should do the visit, Edward asked to change the visit. Ward was notified that E.J. was already en route and offered Edward a ride to the visit. Edward asked to change the visit. Eventually, Edward relented. On the way to the visit, he was angry and agitated toward Ward, blamed Ward for the situation, complained about the foster parents, who are Caucasian, adopting E.J., who is African-American, and called Ward the "white devil."

¶ 61    Addressing E.J.'s siblings, Ward stated that she is very close to G., who is eight years old. They are close in age, and G. had a lot of affection for her and took her under his wing. The foster parents facilitated the relationship. Finally, he stated that Edward's home was appropriate.

¶ 62    Edward testified that he visits with E.J. once per week for one hour. He takes her to a number of different places, including Burger King, the park, and the library. She smiles when they are together, and he feels that he has a strong bond with her. He started visiting less in January and February when the weather was very cold. Also, he missed other visits dues to job-seeking efforts and hospital visits (due to a herniated slipped lumbar disc for which he receives injections). Ward never asked him for documentation for the missed visits. Edward claimed that he reached out to Ward, but would be brushed off. He also reached out to Ward's supervisor. Edward has not been to any school meetings about E.J., nor has he been to any doctor's appointments. He was not aware of the dates of any such meetings or appointments. Ward did not inform him of any such dates.

¶ 63    On December 4, 2019, the trial court found that the State had met its burden and proved that it would be in E.J.'s best interest to terminate Edward's parental rights. Edward appeals.

¶ 64                                II. ANALYSIS

¶ 65    Respondent argues that the trial court erred in determining that he was unfit and in terminating his parental rights. For the following reasons, we reject his arguments.

¶ 66    Proceedings to terminate parental rights are governed principally by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)). The Act provides a two-step process for the involuntary termination of parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must prove that the parent is unfit by clear and convincing evidence. *Id.* Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) lists the grounds under which a parent can be found unfit. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Second, if the court makes a finding of unfitness, the court then considers whether it is in the best interests of the minor to terminate parental rights. *Deandre D.*, 405 Ill. App. 3d at 953. The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interests. *Id.* We will reverse a finding of unfitness only where it is against the manifest weight of the evidence, that is, where the determination is unreasonable. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). We will reverse a best-interests finding only where it is against the manifest weight of the evidence or where the trial court abused its discretion. *Id.* An abuse of discretion occurs where no reasonable person would take the view adopted by the trial court. *In re Joseph J.*, 2020 IL App (1st) 190305, ¶ 26.

¶ 67                                    A. Unfitness

¶ 68    Edward first argues that the trial court erred in finding him unfit. For the following reasons, we disagree and conclude that the trial court did not err in finding Edward failed to make reasonable progress during the period July 29, 2018, to April 29, 2019.

¶ 69    Section 1(D)(m) of the Adoption Act contains separate grounds, any one of which can serve as a basis for a finding of unfitness. 750 ILCS 50/1(D)(m) (West 2018); see also *In re B'Yata*

*I.*, 2014 IL App (2d) 130558-B, ¶ 30 (grounds for finding unfitness under the Adoption Act are independent, and reviewing court may affirm trial court's judgment if the evidence supports any one of the grounds alleged).

¶ 70    Reasonable progress is defined as " 'demonstrable movement toward the goal of reunification,' " (*In re C.N.*, 196 Ill. 2d 181, 211 (2001) (quoting *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000))), and it is measured by the parent's compliance with the service plans and the court's directives, in light of both the condition which caused the child's removal and conditions that became known later and which would prevent the court from returning custody of the child to the parent. *Id.* at 216-17.

¶ 71    Here, the trial court found that Edward failed to make reasonable progress toward the return of E.J. during the period July 29, 2018, to April 29, 2019.

¶ 72    Edward argues that the trial court erred in determining that the State met its burden. During this period, he asserts, he participated in all recommended services and had obtained housing and employment. He notes that he was appropriate and loving during visits, and the only issue DCFS had with him at this time was his inconsistent visits, which he contends he had reasons for and the reasons led to the progress he made toward E.J.'s return home.

¶ 73    The State responds that respondent resided at his brother's home during a portion of the relevant period. The home was deemed inappropriate for E.J. It also argues that respondent missed 50% of scheduled visits between May 2018 and March 2019, well below the 90% attendance goal DCFS had set. The State also notes that, after visits were increased to twice per week, Edward failed to attend the extra visits and the agency reduced the visits to one time per week. Ultimately, he did not progress to unsupervised visits. The State also contends that Edward missed many meetings at Rosecrance and references the letter from Barger after a series of missed visits in the

late summer of 2018. Finally, the State points to records that Edward experienced hallucinations and other mental health symptoms, which, in its view, undermine any argument that he made reasonable progress as a result of his participation in services.

¶ 74    We conclude that the trial court's finding that Edward failed to make reasonable progress toward the return of E.J. during the period July 29, 2018, to April 29, 2019, was not erroneous. Edward did not find suitable housing until March 2019, which was near the end of the nine-month period and over 1½ years after he was released from prison. The evidence also reasonably showed that he struggled to find consistent employment. He relied on temporary jobs, and a DCFS permanency hearing report that was filed on April 2, 2019, stated that Edward was not working. During the nine-month period, he worked at Goodwill between late November 2018 and early March 2019 and was otherwise unemployed or worked at odd jobs.

¶ 75    Most significantly, Edward, per his own testimony and confirmed by Ward and Stacy, missed 50% of his scheduled visits with E.J. (By this court's review of DCFS visit logs for the nine-month period, it appears that he missed 11 out of 29, or 38%, of visits. However, it is unclear if the records are complete for the period.) At the April 29, 2019, permanency review, it was noted that Edward had attended only five visitations since November 2018 (and that he failed to attend a doctor's appointment for E.J.). Edward's service plan required that he attend 90% of scheduled visits. Clearly, he came nowhere close to this goal. Also, Edward never graduated to unsupervised visits, which would have been another step in the progression to the return of E.J. to him.

¶ 76    We acknowledge that the record reflects that visitation was apparently challenging for Edward when there were conflicts with job-search efforts and medical appointments. However, for the majority of the nine-month period, visitation occurred only once per week and it is reasonable to infer that Edward could have scheduled other obligations around visits with his

daughter. (We further note that it was undisputed that Edward was appropriate at the visits, though there were minor issues, including bringing unapproved guests.) We also acknowledge that the record reasonably shows that Edward cooperated with DCFS's recommendations for all assessments (as reflected in the March 2019 and other service plans) and completed services (again, as reflected in the March 2019 and other services plans) and went beyond this to voluntarily continue mental health services (with Rosecrance), the main focus of which, per Barger, was his depression.[1] However, there was evidence presented that he did not maintain communication with Ward once Ward was assigned the case in January 2019, and Barger conceded that there were times when Edward was not consistent with his participation in mental-health services. And, we note, Edward's commendable efforts to address his mental health issues do not erase the fact that he was not consistent with visitation.

¶ 77    In summary, the trial court did not err in finding Edward unfit.

¶ 78                                B. Best Interests

¶ 79    Next, we consider Edward's argument that the State failed to prove that it was in E.J.'s best interests to terminate his parental rights. After a trial court finds a parent unfit, it must determine whether it is in the child's best interests to terminate parental rights pursuant to the Act. 705 ILCS 405/1-3 (West 2018). At the best-interests stage, the court "focuses upon the child's welfare and whether termination would improve the child's future financial, social[,] and emotional

---

[1] Rosecrance records, including a plan of care dated November 9, 2018, stated that Edward reported experiencing visual and auditory hallucinations. Further, a November 2, 2018, DCFS permanency report to the court stated that Edward's therapist reported that Edward had not been on his medication and requested a referral to see a psychiatrist to get back on his medicine.

atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated. Accordingly, at a best[-]interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The trial court "cannot rely solely on fitness findings to terminate parental rights." *D.M.*, 336 Ill. App. 3d at 772. The court must consider the following factors in making a best-interests determination: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and security; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). Additionally, the trial court can consider the nature and length of the child's relationship with his or her present caretaker and the effect that a change in placement would have on his or her emotional and psychological well-being. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78. The trial court need not explicitly reference each of these factors, and we need not rely on any basis used by the trial court in affirming its decision. *Id.*

¶ 80    Edward maintains that the trial court erred in determining that it was in E.J.'s best interests to terminate Edward's parental rights. He points to the evidence that he was appropriate with E.J. and that she identified him as a loving caregiver in her life. He also asserts that E.J. was not aware that Edward could be removed from her life, so her thoughts were not taken into account. Any

community ties, he further asserts, would not be disrupted if E.J. was returned to Edward, because there was no evidence of such issues. Edward claims that there is no assurance that E.J. would continue to have long-distance sibling visitation if his rights were terminated. He also points to his successes in obtaining housing and employment, arguing that there is no reason to deny him and his daughter the chance to be together.

¶ 81    We conclude that the trial court did not err in terminating Edward's parental rights. The evidence presented at the best interests hearing reasonably showed that E.J. had a strong bond with the foster family, especially with the foster mother, where she has been placed for two years. E.J. is comfortable in the home, has lots of toys, and she is developmentally on target. The foster family, contrary to Edward's assertions (and in the absence of evidence that he would do so), is supportive of maintaining relationships with E.J.'s siblings. Indeed, E.J. interacts with her brother, G., to whom she is very close, and they have sleepovers. She also electronically and physically visits with her four siblings in Chicago. Further, the foster family incorporates E.J. into their extended family, and E.J. has gotten to know exchange students whom the foster parents have hosted.

¶ 82    As to Edward, Ward noted that all visits had been in the community, where it is difficult to foster a parent-child relationship. The foster parents had expressed concerns after Edward's increased attendance at visitation after the goal change, noting that E.J. had regressed in potty training and in her anxiousness, which were being addressed in counseling. There were also the issues with Edward's inconsistent visitation and ability to obtain consistent employment. Further, Ward testified to an incident after the fitness hearing, where Edward reluctantly attended a visitation with E.J. and called Ward a "white devil." In light of E.J.'s strong bond with the foster

family, need for permanency, and Edward's continuing issues, we cannot conclude that the trial court erred in its determination.

¶ 83    In summary, the trial court did not err in terminating Edward's parental rights.

¶ 84                                III. CONCLUSION

¶ 85    For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 86    Affirmed.