2022 IL App (2d) 210758-U
No. 2-21-0758
Order filed May 13, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re Z.R.*, a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 18-JA-458 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Mary Linn Green, |
| Appellee v. W.R., Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court's findings that respondent was unfit and that it was in the child's best interests that his parental rights be terminated were not against the manifest weight of the evidence. Affirmed.

¶ 2    The respondent, W.R., appeals from the trial court's order terminating his parental rights to his minor son, Z.R. For the reasons that follow, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4     Respondent is the biological father of Z.R., born October 5, 2018.  His parental rights were terminated on December 14, 2021.  Z.R.'s biological mother's rights were also terminated in the same proceedings but are not at issue in this appeal.[1]

¶ 5                              A. NEGLECT PETITION

¶ 6     On December 14, 2018, the State filed a three-count petition of on behalf of two-month-old Z.R., alleging that he is a neglected minor and that his environment is injurious to his welfare because: Z.R. was not receiving the proper or necessary support, education, medical, or other remedial care required for his well-being, including, adequate food, clothing, and shelter or he was abandoned by his parents, in that Z.R. was diagnosed with non-organic failure to thrive which was attributed to the parents' neglect (count 1); his environment was injurious to his welfare because Z.R.'s parents engaged in domestic violence in his presence, thereby placing him at risk of harm (count 2); and his environment was injurious to his welfare in that he tested positive for THC (marijuana) at birth, thereby placing him at risk of harm (count 3).  See 704 ILC 405/2-3(1)(a), (b) (West 2020).

¶ 7     This case developed after the Department of Children and Family Services (DCFS) received a report of a domestic-violence incident that occurred on November 26, 2018, between respondent and Z.R.'s mother. The parents were arguing about Z.R.'s care which led to a physical altercation in the presence of Z.R. The mother was arrested, and a no-contact order was entered regarding the mother and respondent.  At the time, there was already an intact case in the home

_____

[1] The proceedings in the trial court also involved the biological mother's two other children and their putative fathers.  The trial court's decisions as to those parties are not before this court. Therefore, those parties will be discussed in this decision only when pertinent to the issues at hand.

that preceded Z.R.'s birth which required the mother and putative father of one of the other children to comply with services.

¶ 8    Thereafter, on December 11, 2018, DCFS received a report from a nurse practitioner expressing concerns for Z.R.'s well-being and care. Although Z.R. was born in October, he was not released from the hospital until November 17, 2018, because he was born two-months prematurely and tested positive for marijuana exposure. At a medical appointment on December 10, 2018, Z.R.'s pediatrician observed that Z.R. had lost weight. His mother reported that there had been several days where Z.R. did not act like he was hungry and did not want to eat, so she did not give him a bottle. At the direction of her pediatrician, the mother took Z.R. to the hospital where he was examined and released. Upon learning of Z.R.'s discharge, the pediatrician became concerned and made numerous attempts to contact the mother but was unable to reach her. The police were sent to the home for a welfare check. The police took Z.R. to the hospital, and he was admitted. On December 12, 2018, DCFS spoke with the treating physician who stated that Z.R. was diagnosed with non-organic failure to thrive and he suspected it was the result of the parents not feeding Z.R. adequately. He noted that the parents did not seem very involved and were not concerned about the seriousness of Z.R.'s weight loss. The mother admitted to using marijuana and cigarettes during pregnancy. The mother had not been compliant with the intact services. Z.R. was taken into protective custody.

¶ 9    A shelter care hearing was held on December 14, 2018. At that hearing, the State called Jaime Kitchen, a DCFS investigator, to testify. Kitchen testified as to the facts set forth above. Respondent waived a shelter care hearing. The court found that Z.R. was neglected and awarded guardianship and custody to DCFS.

¶ 10                    B.  ADJUDICATION AND DISPOSITION

¶ 11    The adjudicatory hearing was held on March 1, 2019.  The parties entered into an agreement whereby respondent stipulated to the allegations in count 3 of the neglect petition and counts 1 and 2 were dismissed "with the agreement that the parents would receive any services that may be based upon those counts." Z.R. was adjudicated a neglected minor.

¶ 12    An integrated assessment was completed on April 4, 2019. The assessment stated that respondent was unemployed, having been fired from his last job in April or May 2018 for "too many no calls, no shows."  He was currently staying with his uncle.  Respondent stated that the incident between him and Z.R.'s mother that led to her arrest was a misunderstanding and there was no domestic violence in their relationship.  Respondent has a significant criminal history, including "several prison stays throughout his life."  His last arrest was in 2018 for criminal trespass to property.  According to the report, respondent admitted that he has used marijuana since he was a child.  He stated that he currently smokes marijuana twice a day.  He explained that he uses marijuana as an "escape" and "to celebrate" and because "it is fun."  Initially, respondent did not report any mental-health issues or treatment, but it was later discovered that he had completed a mental-health assessment at Rosecrance prior to DCFS involvement in this case and he had been involved in a mental-health program there.  Based on the assessment, respondent was recommended for individual counseling, parenting education, a substance-abuse assessment, a mental-health assessment, and housing stability assistance. The report concluded that reunification was "guarded" because respondent "does not appear to take any responsibly for the maltreatment of his son."  The report noted respondent provided conflicting stories and he did not appear interested in any "real progress to correct the conditions that led to DCFS involvement."

¶ 13    At the dispositional hearing on April 22, 2019, respondent stipulated that he was unfit, unable, or unwilling to care for Z.R.  The court ordered guardianship and custody of Z.R. to remain

with DCFS. Respondent agreed to cooperate with DNA testing;[2] cooperate with DCFS regarding financial responsibilities for Z.R.'s substitute care; cooperate with all substance-abuse, mental-health, and other services required by DCFS; remain drug and alcohol free; and comply with all orders of protection, including the no-contact order with Z.R.'s mother. Visitation was ordered to be at the discretion of DCFS.

¶ 14                          C.  PERMANENCY REVIEWS

¶ 15    The first permanency-review hearing was held on October 7, 2019. The court took judicial notice of the permanency-hearing report and service plan filed September 26, 2019.  The trial court found that respondent had not made reasonable efforts towards reunification.

¶ 16    According to the reports, respondent was required to cooperate with Lutheran Social Services of Illinois (LSSI), remain drug and alcohol free, complete an updated substance-abuse assessment, engage in individual counseling, earn his high school equivalency certificate (GED), and participate in parenting education and mental-health treatment.  Although he reportedly completed a mental-health assessment with Rosecrance prior to DCFS involvement in this case, he has not provided any documentation to the case worker.  He failed to complete updated substance-abuse and mental-health assessments.  Respondent was referred to an LSSI group to be matched with an individual counselor.  He was unsuccessfully discharged from that group for failure to engage.  Respondent completed a domestic-violence assessment and was not referred for services.  Respondent missed numerous appointments to commence parenting education, and his referral was "closed" due to lack of engagement. Respondent tested positive for marijuana in July

_____

[2] The court later determined that DNA testing was not required because respondent signed Z.R.'s birth certificate.

2019 and failed to complete a test scheduled in September 2019. Respondent missed scheduled meetings with his caseworker. The report stated that respondent had participated in supervised visitation with Z.R., once per week but did not always provide things for Z.R. during the visits such as diapers or food. Respondent and Z.R.'s mother continued to openly violate the no-contact order issued by the court. The permanency-hearing report recommended that respondent be found to have not made reasonable efforts and that Z.R. remain in the custody of DCFS with a goal of return home in 12 months.

¶ 17 A second permanency-review hearing was held on September 8, 2020. The court took judicial notice of the permanency-hearing report filed August 28, 2020.

¶ 18 The report revealed that respondent had missed three of four drug tests during the review period. When he appeared for the last drug test during the review period on August 19, 2020, he admitted that he smoked marijuana as recently as the previous day. Respondent reported that he was still homeless and unemployed. He had not taken steps to earn his GED. The report stated that respondent had consistently attended visits with Z.R. every other week, but still did not always provide things for Z.R. during the visit. The report noted that visitation had not been increased and remained supervised because respondent had not made the necessary progress in services to address the reasons for involvement. The report concluded with a recommendation that respondent be found to have made no reasonable efforts or progress towards reunification.

¶ 19 At the hearing, respondent's counsel proffered that respondent was unable to get into parenting classes due to Covid-19 delays, he was engaged in counseling, he signed a release to allow the caseworker to contact his counselor at Rosecrance, and he was inquiring about getting a medical marijuana card for his mental-health issues. Respondent reported that he recently found employment through a temporary-employment agency, and he has worked one day and was

expecting to be assigned more work. He said he had been living with a new girlfriend since January. The court found that respondent had not made reasonable progress but deferred making a finding as to reasonable efforts. The court noted that based on respondent's work schedule, there appeared to be no reason for him to miss three of four drug tests and noted that respondent "does not have a medical [marijuana] card" and "he should not be dropping positive for marijuana at this point regardless."

¶ 20    A third permanency-review hearing was held on December 4, 2020, and the State asked that the goal be changed to substitute care pending termination of parental rights. The permanency-hearing report filed on November 20, 2020, was the only evidence presented.

¶ 21    The report indicated that respondent was scheduled for four drug tests during the review period. He did not appear for the test in September 2020, he tested positive for marijuana in October, and he tested negative on the last two tests which were in November. Respondent was asked numerous times to complete an updated substance-abuse assessment, but he had not done so. Respondent claimed to be working with a counselor at Rosecrance, but the case worker had not seen any reports regarding his counseling. The report noted that respondent was required to achieve 90-days' sobriety to attend parenting classes. Respondent initially reported that he was still homeless, however, he later stated that he was living with his girlfriend. He explained that he was unsure if he was allowed to live in her apartment because it was public housing. Respondent had not otherwise acquired his own housing. Respondent still had taken no steps to complete his GED and remained unemployed. Respondent had consistently participated in visits every other week with Z.R. and provided diapers and food during their visits. The report concluded that "While [respondent] has appeared to make more efforts throughout this period, there is no progress being

made. There are still services that need to be started and completed. The length of time that [Z.R.] has been in care is of great concern to the agency."

¶ 22    At the hearing, respondent stated that he was 45-days or "two drops" clean of marijuana. He stated that he had been to two group-therapy classes, and he was waiting for parenting classes to begin. His counsel argued that he had made reasonable efforts and reasonable progress and stated "the next six months are going to be pivotal to see how my client engages in parenting classes and moving forward." He asked that the goal remain return home within 12 months.

¶ 23    The court concluded that respondent had made reasonable efforts, but not reasonable progress and maintained the goal of return home within 12 months.

¶ 24    The last permanency-review hearing was held on April 6, 2021, and the court considered a permanency-hearing report filed on March 17, 2021. The report stated that respondent was scheduled for four drug tests. He tested negative on December 15, 2020. His second test was on January 4, 2021; however, the test was rejected because it was determined that the urine sample respondent provided was not his own. The report explained further that respondent arrived for the test smelling "overwhelmingly" of marijuana and his sample and the cup were cold. Respondent tested positive for marijuana on the third drug test in February 2021. The status of the fourth test scheduled for March 16, 2021, was not in the report.

¶ 25    Due to another positive drug test, respondent was required to complete another substance-abuse assessment. Respondent was also unsuccessfully discharged from individual counseling. Because respondent has been unable to achieve 90-days' sobriety, he was not eligible for parenting classes. Respondent was reportedly "very argumentative and combative during a conversation" regarding his marijuana use and stated that DCFS "does not care about marijuana use and that [Z.R.] was not removed due to substance abuse." Respondent was informed that his continued use

of marijuana was in direct violation of a court order and had impacted his ability to successfully engage in the necessary services to address the reasons for Z.R.'s removal. Despite reminders, respondent did not participate in the family and team meeting scheduled for January 6, 2021. Respondent had not taken steps to earn his GED or obtain steady employment. Respondent continued to consistently attend supervised visitation and provided necessities for Z.R. during the visits. The recommendation was that respondent be found to have not made reasonable efforts or progress towards reunification.

¶ 26    The court found respondent had not made reasonable efforts or progress and changed the goal to substitute care pending termination of parental rights.

¶ 27                                D.  TERMINATION

¶ 28    On July 22, 2021, the State filed a motion for termination of parental rights and power to consent to adoption. The four-counts against respondent alleged that he:  (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare; (2) failed to protect the minor from conditions within the environment injurious to his welfare; (3) failed to make reasonable efforts to correct the conditions that caused the minor to be removed during a nine-month period after the adjudication of neglect; and (4) failed to make reasonable progress toward the return of the minor during a nine-month period after the adjudication of neglect. See 750 ILCS 50/1(D)(b), (g), (m)(i), (m)(ii) (West 2020).  The nine-month period for count 3 was March 1, 2019, to November 20, 2019.  The nine-month periods for count 4 were October 7, 2019, to July 6, 2020, and June 5, 2020, to December 4, 2020. Respondent was arraigned on May 18, 2021.

¶ 29                                1.  Fitness

¶ 30    The fitness hearing commenced on September 10, 2021. The State called Megan Denk, a child-welfare specialist with LSSI, to testify.  Based on Denk's foundational testimony, the following exhibits were entered into evidence:  two integrated assessments (approved on February 26, 2019, and April 4, 2019), and four service plans (dated June 18, 2019, December 2, 2019, May 27, 2020, and November 24, 2020).  The court also took judicial notice of other documents including, the orders of adjudication and disposition, and the four permanency reviews.

¶ 31    Denk testified that respondent was required to complete domestic-violence, mental-health, and substance-abuse assessments; individual counseling; parenting education; and any follow-up recommendations.  Respondent was ordered to remain drug and alcohol free, however, Denk testified that he was not able to maintain sobriety for any extended amount of time during this case.  During the pendency of this case, he was asked to complete 29 drug tests, but he completed only 12.  Of the 12 he did complete, respondent tested positive for marijuana use on all but two tests.

¶ 32    Denk stated that respondent completed a domestic-violence assessment and was deemed to not need services.  He previously completed a mental-health assessment with Rosecrance through the PATH program which "focuses on individuals that have mental illness along with homelessness."   Denk testified that respondent had been homeless for most of the pendency of this case.  He was assigned a housing advocate to provide him assistance in getting his own housing, but he was never able to get his own housing.  At one point, he reported that he was no longer homeless because he was living with his girlfriend; therefore, he was no longer eligible for the PATH program.  Under the circumstances, Denk stated that she did not consider this to be stable housing.  He then engaged in individual counseling for a "short period of time," but never provided proof of progress and did not complete the program.  Respondent did not complete any parenting education.  Numerous times, he did not show up for parenting program assessments.

Denk explained that although marijuana use has been legalized in Illinois, it remains a "requirement [to participate in parenting classes] that parents are clean and sober in order to fully absorb and receive the information that's presented in education." Denk testified that for these reasons, respondent would not have been allowed to participate in the parenting class program even if he showed up for an initial assessment. Denk testified that respondent had participated regularly in supervised visitation with Z.R. He did not progress to unsupervised visitation because there remained concerns regarding his mental health, ability to parent and safely supervise a child, and his substance abuse. Respondent did not complete enough of the services to be reasonably close to Z.R. being returned home.

¶ 33 Respondent testified on his own behalf. He stated he was 46 years old. He had lived at the same address with his girlfriend since June 2021, and his name is on the lease. Before that, he lived with her at another apartment for about a year, and before that, he was homeless. He testified that he completed some individual counseling though the PATH program until he moved in with his girlfriend and he was no longer eligible for that program. He stated that he consistently participates in supervised visitation with Z.R. which occurs for two-and-a-half hours every week. During those visits he takes Z.R. to the park, feeds him, changes his diaper, and has taken him to get his haircut. Respondent testified that he has clothes and shoes for Z.R. Respondent said he has never been intoxicated or high during a visit. He admitted that he was diagnosed "paranoid schizophrenic and bipolar." He currently takes Trazodone which was prescribed by a psychiatrist at Rosecrance. He admitted that he had not seen the psychiatrist in a year. When asked about his marijuana use, the following colloquy took place:

> Q: Okay. So I know that you care very deeply about your child—
>
> A: Yes.

Q: —and part of the reason you weren't able to progress in services was because of the marijuana use. Why were you not able to stop that for the sake of your child?

A: No. That's not the reason why I wasn't able to progress. The reason why I wasn't able to progress is because I was homeless and I was in—and I was in a bogus situation.

Q: Okay. So you don't think the daily marijuana—

A: No. Because I—

Q: —use has anything to do with it?

A: No. Because I've never been—I've never been—I've been smoking marijuana since I was nine and I've never had— never had trouble. Never been arrested. None of that for [ ] smoking marijuana. I've had no police called [*sic*] on me for domestic violence for marijuana. Nothing—

Q: But do you—

A: —at all, period.

¶ 34 Respondent then described that he has been taking care of children since he was nine years old and never had a complaint. He stated that when he was a teen, he "used to do worse than what I'm doing now" and said he would "get drunk and high then." The discussion continued:

Q: Okay. Do you recall your caseworker telling you that you needed to have clean drops and stop the—

A: Yeah, I do.

Q: —marijuana?

A: Yes, I do.

Q: Okay. And so did you choose not to do that because—

A: No.

Q: —you felt like marijuana hadn't been a problem for you?

A: Yes. Yes. I'm not even going to sit here and try to make up an excuse. Yes.

Q: Okay. Even though it meant you couldn't do some of the services?

A: I could have did [*sic*] some of the services, but I felt like I didn't—I felt like I shouldn't have to do them because I've been raising kids for so long. And I feel like there's nothing nobody—well, I ain't going to say there's nothing nobody can tell me, but I feel like, you know what I'm saying, I've been raising kids for 35 some-odd years. I know how to raise kids. [ ] I've never had a police complaint against me against kids."

¶ 35    On cross-examination, respondent referred to himself as becoming a "first-time dad at 43" when Z.R. was born. Respondent testified that he did not believe that failure to thrive is a medical diagnosis. He also testified that he believed he was not given a chance to raise his son and "It was only when I was in that situation with [Z.R.'s mother] and her family was I going through these problems." Respondent acknowledged that he knew the purpose of treatment goals in counseling. When asked if he worked on his treatment goals while in counseling he responded "No, I did not. No, I did not." When asked whether his psychiatrist knew that he was smoking marijuana, he replied "No, she does not." He said he did not know whether marijuana use interferes with his other medication. Respondent testified that he completed counseling and received a certificate and believes he sent it to Denk. When asked whether he smoked marijuana around children, he said he does not. He explained that he smokes in the garage, not the house. He acknowledged that children may be inside the house, but they do not know about his smoking because "that's none of their business."

¶ 36   On November 29, 2021, the court ruled on the fitness stage of the proceedings, finding that the State had met its burden by clear and convincing evidence as to count 1 and count 4 on the motion to terminate respondent's parental rights. The court reviewed the evidence presented, noted that there remain "continuing issues with mental health concerns, questionable ability to supervise the child, and substance abuse." The court appreciated respondent's "forthrightness in his testimony" and commented that the one thing he would not do to maintain his interest, concern, or responsibility was to give up marijuana which prevented him from obtaining certain services and making any progress towards reunification.

¶ 37                                    2.  Best Interests

¶ 38   The best-interests hearing was held on December 14, 2021. Denk testified again as the State's only witness.  She stated that Z.R. is now three years old, but he was placed with the foster family when he was two months old.  Z.R. has been in the same traditional foster home for the duration of this case.  His family includes his foster mother, foster father, and their daughter who is nearly six years old.  He is comfortable and happy in the home and interacts very positively with his foster family. Z.R. is on-track developmentally, and he participates in speech services. The family is committed to adopting him.

¶ 39   On cross-examination, Denk testified that Z.R.'s weekly visits with respondent were positive for the most part. Z.R. calls respondent "dad."  She stated that respondent never progressed beyond supervised visits because there were still safety concerns regarding his on-going substance use and mental-health issues and because he did not engage in required services.  Z.R. has been in care his whole life and the foster parents take care of Z.R.'s day to day needs.  Respondent has provided some clothing and shoes for Z.R.  Z.R. refers to his foster parents as "mom" and "dad." She stated that Z.R.'s identity is tied to his foster family.  His foster parents are sensitive to the

fact that Z.R. has a different cultural background and are willing to develop his understanding of it. Z.R. has a normal sibling relationship with his foster sister. Z.R. shares a cultural background with the foster family of his biological sibling, and he has a good relationship with them. The foster family is committed to facilitating a relationship between Z.R. and his biological sibling. Denk testified that respondent has not fulfilled any parenting requirements for Z.R. beyond participating in weekly visits.

¶ 40    Before the close of proofs, respondent's counsel proffered the following information. Respondent had found full-time employment approximately three weeks before the hearing and he had maintained stable housing for over a year.

¶ 41    After hearing arguments of counsel, considering the evidence presented and all of the statutory best interest factors, the court found that the State had met its burden of proof by a preponderance of the evidence that it was in Z.R.'s best interests that respondent's rights be terminated. The court order terminating respondent's parental rights and consenting to adoption was entered on December 14, 2021. This appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.,* 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.,* 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interests. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.,* 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb

a trial court's finding with respect to parental unfitness or a child's best interests unless it is against the manifest weight of the evidence. *In re N.B.,* 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.,* 2017 IL App (2d) 160657, ¶ 16. "Furthermore, each case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value." *In re Daphnie E.,* 368 Ill. App. 3d 1052, 1065 (2006).

¶ 44                                                         A. FITNESS

¶ 45     Respondent argues that the trial court erred in finding him unfit on counts 1 and 4 of the motion for termination of his parental rights.

¶ 46     We first note that it is well settled that "[W]hen parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court." *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004) (citing *In re D.D.,* 196 Ill. 2d 405, 433 (2001)). Hence, if we affirm the trial court's decision on one ground, we need not consider the court's decision on the other grounds.

¶ 47     Count 4 of the motion for termination of parental rights alleged that respondent was unfit pursuant to section 50/1(D)(m)(ii) of the Adoption Act. That section provides that a parent may be found unfit for failure "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D) (m)(ii) (West 2020). In this case, the nine-month periods for count 4 were October 7, 2019, to July 6, 2020, and June 5, 2020, to December 4, 2020. The Adoption Act provides further that when a service plan has been established to correct the conditions that were the basis for removal of the child and if those services were available, then failure to make reasonable progress

includes the "parent's failure to substantially fulfill his or her obligations under the service plan and to correct the condition that brought the child into care." *Id.* Reasonable progress is judged by an objective standard that requires, at a minimum, "measurable or demonstrable movement" toward reunification. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. The "benchmark" for measuring a parent's progress "encompasses the parent's compliance with the service plans and the court's directives in light of the condition that gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.,* 196 Ill. 2d. 181, 216-17 (2001).

¶ 48    Respondent does not argue that he made reasonable progress in this case, rather he argues that the trial court's decision is against the manifest weight of the evidence because the State "failed to prove that any of the services demanded of [respondent] included [*sic*] the demand that he remain alcohol and (legal) drug free, were necessary to correct a condition that led to Z.R.'s removal, or to address a deficiency of [respondent] as a parent that would prevent his return." This argument has no merit.

¶ 49    After the dispositional hearing where respondent stipulated that he was unfit, unable, or unwilling to care for Z.R., he was required by the trial court to comply with, *inter alia*, all substance-abuse, mental-health, and other services required by DCFS and remain drug and alcohol free. The DCFS service plans required respondent to complete an integrated assessment; complete mental-health, substance-abuse, and domestic-violence assessments and follow any recommendations made; participate in individual counseling; participate in parenting education; remain drug and alcohol free; earn his GED; and engage with housing stability resources. A review of the record in this case reveals that all of these services reasonably related to remedying the

condition that gave rise to the finding of neglect or other conditions which later became known and would prevent Z.R.'s return to respondent's care.

¶ 50    At the adjudication, respondent stipulated that Z.R,'s environment was injurious to his welfare in that he tested positive for marijuana at birth, thereby placing him at risk of harm. Although the other two counts of the neglect petition were dismissed, respondent agreed to "receive any services that may be based upon those two counts." Count 1 alleged an injurious environment due to respondent's failure to give proper and necessary support, education, medical, or other remedial care required for Z.R.'s well-being which involved the failure-to-thrive diagnosis. Count 2 alleged an injurious environment due to domestic violence. Therefore, respondent agreed to be subject to services including, a domestic-violence assessment, mental-health assessment, parenting education, and individual counseling.

¶ 51    Furthermore, respondent was homeless and unemployed at the beginning of this case and during most of its pendency. Therefore, DCFS's requirements that respondent earn a GED and engage with housing stability resources were reasonably related to a condition which later became known and would prevent Z.R.'s return to respondent, namely, respondent's lack of a secure home and steady source of income to provide support for Z.R.

¶ 52    Respondent primarily takes issue with consideration of his twice-daily use of marijuana, arguing that the State and the trial court "treated the use of marijuana as per se [*sic*] rendering [respondent] unfit, regardless of whether there was any actual impact, or risk of harm, to the children." However, Z.R.'s parent's use of marijuana is reasonably related to the reason he was removed from their home, namely, that Z.R. tested positive for marijuana exposure at birth. Notwithstanding the legality of the use of marijuana in Illinois, when a neglect petition is based upon a child having been born exposed to marijuana, the parents' use of marijuana in the home is

relevant to the matter of their fitness. Under the circumstances, the directives and services related to respondent's admitted twice-daily use of marijuana were warranted. See *In re K.I.*, 2016 IL App (3d) 160010, ¶ 43 (finding that the respondent's marijuana use was not an irrelevant or insignificant factor in determining fitness where respondent's marijuana use was a primary issue that led to the removal of the child).

¶ 53    Although not directly addressed by respondent, we turn to the trial court's findings that respondent failed to make reasonable progress towards reunification. After careful review, we conclude that the decision was not against the manifest weight of the evidence.

¶ 54    Despite that respondent was required to refrain from the use of drugs and alcohol during the pendency of this case, the record is replete with evidence that he failed to do so. Denk testified that respondent was unable to maintain sobriety for any extended amount of time during the pendency of this case. Respondent only completed 12 of 29 drug tests, and of the 12 tests he completed, all but 2 were positive for marijuana. Respondent testified that his case worker told him that he needed to stop using marijuana in order to participate in services and make progress toward reunification. The trial court admonished respondent of this fact on numerous occasions. Respondent testified that he knew he was supposed to refrain from drug use, but he chose not to, stating "I'm not even going to sit here and try to make up an excuse."

¶ 55    Respondent also was ordered to participate in parenting classes, but he failed to do so. Respondent knew that in order to enroll in these classes he was required to have 90-days' sobriety. As Denk explained, although marijuana use has been legalized in Illinois, it remains a "requirement [to participate in parenting classes] that parents are clean and sober in order to fully absorb and receive the information that's presented in education." It appears from the record that respondent made some effort in November 2020 by having his only two clean drug tests, resulting

in 45-days' sobriety, and indicating that he intended to enroll in parenting classes. However, by the next permanency review, he had multiple positive drug tests yet again. When asked about parenting classes, respondent testified that he believed he could have participated in such services but explained that he believed he should not have to do so because he had experience raising children. He stated: "And I feel like there's nothing nobody – well, I ain't going to say there's nothing nobody can tell me, but I feel like, you know, what I'm saying I've been raising kids for 35 some-odd years. I know how to raise kids." He stated: "I've never had a police complaint against me against kids." Respondent reiterated that he did not believe he needed parenting classes because he had been taking care of children since he was nine years old, though he also acknowledged that he was a "first-time dad at 43" when Z.R. was born.

¶ 56    Respondent also failed to successfully participate in mental-health services and counseling. Respondent acknowledged that he had been under the care of a psychiatrist, but he stated that he had not seen the doctor in a year. It is notable that respondent admitted that his psychiatrist did not know about his twice-daily use of marijuana. Though respondent did participate in some counseling, he was unsuccessfully discharged and never completed a program. Respondent testified that he knew the purpose of treatment goals that were set during counseling. When asked whether he worked on his treatment goals while in counseling, he replied "No, I did not. No, I did not."

¶ 57    The record shows that respondent cares for Z.R.; his testimony indicated that he was excited to have his first-born child at the age of 43. He regularly participated in visitation and provided clothes and food for Z.R. during those visits. However, in the three years that Z.R. has been in foster care, respondent's visitation never progressed beyond supervised visits once weekly. It is clearly established in the record that respondent failed, and oftentimes refused, to engage in

services necessary to remedy the condition that gave rise to the finding of neglect and other conditions which became known later and prevented Z.R.'s return to respondent's care. Therefore, we conclude that the trial court's determination that respondent is unfit for failure to make progress towards reunification was not against the manifest weight of the evidence.

¶ 58                                B.  BEST INTERESTS

¶ 59     Following a finding of unfitness, the focus of the termination proceedings shifts to the child. *In re Davon H.,* 2015 IL App (1st) 150926, ¶ 75. "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphasis in the original.) *In re D.T.*, 212 Ill 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *Id.*

¶ 60     When making its best interests determination, the trial court must consider the following factors in the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). "A court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being." *In re Tiffany M.,* 353 Ill. App. 3d 883, 893 (2004).

¶ 61    In this case, the trial court stated that it considered the statutory best interest factors as they relate to Z.R.'s age and developmental stage, all of the evidence and arguments of counsel and found that the State met its burden of proving by a preponderance of the evidence that it would be in Z.R.'s best interest to terminate respondent's parental rights the minor.

¶ 62    Respondent argues that the trial court's decision is against the manifest weight of the evidence.  Focusing on the cultural difference between Z.R. and his foster family, respondent contends that his "closeness" to Z.R. "combined with the natural cultural affinity they share, and will increasingly share in the future, make it clear that it was not in Z.R.'s best interests that [respondent's] parental rights be terminated."  He also points out that he visited with Z.R. without incident over the three years this case was pending and has provided appropriate items to meet Z.R.'s needs like food, clothing, and toys.

¶ 63    A review of the record reveals that Z.R. has lived with his foster family for three years—since he was two months old.  Denk testified that Z.R.'s identity is tied to his foster family.  He refers to his foster parents as mom and dad and has a normal sibling relationship with their daughter.  His foster sister, who is nearly six years old, is loving towards Z.R. and eager to show him things and "be a big sister to him."  Z.R.'s foster family provides him a safe and loving environment, and they take care of all of his daily physical and emotional needs.  Z.R. is doing well developmentally, and he participates in speech services. Denk observed that Z.R. is comfortable and happy in the home and interacts with his family very positively.  Though they are of a different cultural background, the foster parents expressed willingness to help Z.R. develop an understanding of his cultural background.  They also are willing to facilitate a relationship between Z.R. and his biological sister, who is also in foster care with a family who shares his cultural background.  Denk testified that Z.R.'s foster parents are "more than willing to adopt."

¶ 64    Though respondent has expressed his interest in maintaining the parent-child relationship with Z.R., this desire must yield to the child's interest in a stable, loving home life. In this case, we cannot say that the trial court's determination that it was in Z.R.'s best interests that respondent's parental rights be terminated was against the manifest weight of the evidence. Therefore, we affirm.

¶ 65                          III. CONCLUSION

¶ 66    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 67    Affirmed.